**John A. PLISKA and Stanley T. Pliska, Plaintiffs-Appellants,**

v.

**CITY OF STEVENS POINT, WISCONSIN and James Benz, Defendants-Appellees.**

**No. 86–2360.**

United States Court of Appeals, Seventh Circuit.

Argued Feb. 17, 1987.

Decided July 14, 1987.

John T. Manning, Wisconsin Rapids, Wis., for plaintiffs-appellants.

Nadine I. Davy, Anderson, Fisher, Shannon, O'Brien & Rice, Stevens Point, Wis., for defendants-appellees.

Before BAUER, Chief Judge, CUMMINGS and POSNER, Circuit Judges.

BAUER, Chief Judge.

The plaintiffs, John and Stanley Pliska, brought this 42 U.S.C. § 1983 action challenging two City of Stevens Point, Wisconsin ("Stevens Point" or "the City") ordinances as unconstitutionally vague and overbroad. In addition, John Pliska sought damages for an allegedly illegal stop and arrest. The district court held that the constitutional challenges to the ordinances were barred by the doctrine of *res judicata* and granted summary judgment for the City. A jury found in favor of the police officer on the illegal stop and arrest claims. We affirm.

## I.

John Pliska and his father, Stanley Pliska, own various residential properties in

Stevens Point. The Building and Premises Maintenance and Occupancy Code of Stevens Point[1] ("the Code") forbids an owner of a building or premise from maintaining his property in an unsightly or unsanitary manner. In September 1979, the building inspector for the City issued a complaint against John Pliska pursuant to § 21.03(4) of the Code, charging him with "fail[ing] to store and dispose of rubbish [on his property] in a clean and sanitary manner." Pliska was tried before a judge in the Circuit Court of Portage County, Wisconsin. He appeared *pro se*, was found guilty and fined $30.00. He did not challenge the constitutionality of the ordinance or appeal.

In August 1981, the building inspector issued a complaint against John Pliska for violating § 21.03(11) of the Code, which provided:

> No persons shall store, place or allow conditions or materials that may serve as food or harborage for rodents or insects or store, place or allow any health nuisance, source of filth or cause of sickness. No person shall suffer, permit, or allow vegetative matter, which may be unsightly to, incompatible with, or repugnant to neighboring residential or commercial premises.

He was again tried before a judge in the Circuit Court of Portage County. This time he was represented by an attorney who moved to dismiss the complaint asserting that § 21.03(11) was unconstitutional on its face and as applied because it "charges an offense that is unconstitutional and fail[s] to give proper notice of what [conduct it] forbid[s]." The court rejected this defense and found Pliska guilty, ordering him to pay a $25.00 fine. Again, he did not appeal.

In March 1984, John and Stanley Pliska[2] were each charged with violating §§ 21.-03(9) and (11) of the Code. At that time, § 21.03(9) provided:

> No occupant of a premise or premise unit shall accumulate rubbish, boxes, lumber, scrap metal, or any other material in such a manner that may provide a rat harborage in or about any premise or premise unit.

Both men were represented by an attorney who moved to dismiss the complaints on the ground that the "ordinance required [them] to correct the condition, but did not specify what to do." The motion was denied. A jury found them both guilty and they were each fined $100.00. The court stated, however, that the fine would be reduced to $10.00 if it received notice within thirty days that the Pliskas had cleaned up their properties. According to the Pliskas, at the conclusion of the trial, the City Attorney threatened them with daily fines of up to $100.00 and serial prosecution if they did not clean up their properties. No appeal was taken from the verdicts.

John Pliska subsequently began collecting evidence for a lawsuit in which he intended to show that his property was not in a significantly different condition than that of other property owners in the City who had not been prosecuted under the Code. On June 11, 1984, while Pliska was inspecting properties which he believed to be in violation of the Code, he was stopped and detained by James Benz, a Stevens Point police officer.

The Pliskas brought this 42 U.S.C. § 1983 action against Stevens Point and Benz, alleging violations of their First, Fourth, Ninth and Fourteenth Amendment

---

**1.** The building inspector for Stevens Point investigates complaints about the condition of property in the City. If the inspector determines that a property is in violation of the Code, the owner is orally requested to remedy the violation. If the owner does not comply, he is issued a written notice identifying the section of the Code violated and the nature of the violation. *See* § 21.13. The owner is then provided a reasonable time to remedy the violation. If the violation is not remedied, however, a complaint is issued against the owner. Any person who wishes to contest a notice of a violation may file a petition with the Public Protection Committee. *See* § 21.16. If the person is unsatisfied with the decision of the Committee he may seek judicial review within twenty days of the Committee's decision. *Id.*

**2.** Stanley Pliska was also charged with violating § 21.03(19) of the Code, which forbids an owner of a residence from openly storing "junked" motor vehicles on his property for over three days. Stanley Pliska does not challenge the constitutionality of this ordinance.

rights. They sought a declaration that §§ 21.03(9) and (10) of the current Code are unconstitutionally vague and overbroad on their face and as applied to them. The Pliskas also sought an injunction against further prosecutions and damages for the prior prosecutions. In addition, they claimed that they were being subjected to serial prosecutions for the same conduct and that the City was selectively enforcing the Code against them. Finally, John Pliska alleged that Benz had illegally stopped and arrested him without probable cause while he was gathering evidence for this lawsuit.[3]

The district court granted summary judgment to the City on the claims challenging the facial validity of the Code, holding that they were barred by *res judicata* because they were or should have been raised in the earlier state court proceedings. The court found, however, that the claims of serial and selective prosecution were not barred and scheduled them to proceed to trial along with the illegal stop and arrest claims. On the first day of trial the Pliskas voluntarily dismissed the serial and selective prosecution claims with prejudice. A jury found in favor of Benz and against John Pliska on the illegal stop and arrest claims. The district court denied Pliska's motion for a directed verdict. The Pliskas appeal.

## II.

▪ The first issue before this court is whether the district court erred in holding that the constitutional challenges to the facial validity of the ordinances were barred by the prior state court proceedings. Under 28 U.S.C. § 1738, federal courts must give state court judgments the same preclusive effect as would be given under the law of the state that rendered the judgment. *Parsons Steel, Inc. v. First Alabama Bank*, 474 U.S. 518, 106 S.Ct. 768, 769–70, 88 L.Ed.2d 877 (1986); *Migra v. Warren City School District Board of Education*, 465 U.S. 75, 81, 104 S.Ct. 892, 896,

79 L.Ed.2d 56 (1984); *Kremer v. Chemical Construction Corp.*, 456 U.S. 461, 466, 102 S.Ct. 1883, 1889, 72 L.Ed.2d 262 (1982); *Torres v. Rebarchak*, 814 F.2d 1219, 1222 (7th Cir.1987). This rule applies in § 1983 actions with respect to issues actually litigated as well as to those which could have been but were not litigated in the state proceedings. *Migra*, 465 U.S. at 83–84, 104 S.Ct. at 897; *Allen v. McCurry*, 449 U.S. 90, 104, 101 S.Ct. 411, 420, 66 L.Ed.2d 308 (1980); *Jones v. City of Alton*, 757 F.2d 878, 883 (7th Cir.1985); *Krison v. Nehls*, 767 F.2d 344, 347–48 (7th Cir.1985). More importantly to this case, the rule applies when a party seeks to raise a constitutional challenge in a federal civil rights action which could have been, but was not, raised as a defense in prior state proceedings. *Henry v. Farmer City State Bank*, 808 F.2d 1228, 1235 (7th Cir.1986); *Vandenplas v. City of Muskego*, 753 F.2d 555, 559 (7th Cir.), *cert. denied*, 472 U.S. 1018, 105 S.Ct. 3481, 87 L.Ed.2d 616 (1985); *Lee v. City of Peoria*, 685 F.2d 196, 199 (7th Cir.1982). Federal courts will not apply *res judicata*, however, if the plaintiff did not have a full and fair opportunity to litigate his claim in state court. *Jones*, 757 F.2d at 884; *Lee*, 685 F.2d at 201. This requirement is met as long as the state proceedings satisfy the minimum procedural requirements of the Due Process Clause. *Id.*

▪ Our determination of whether the Pliskas' constitutional challenges are barred depends initially upon the *res judicata* effect of the Wisconsin judgments under Wisconsin law. *Krison*, 767 F.2d at 349; *Vandenplas*, 753 F.2d at 559. Under Wisconsin law, a final judgment on the merits in a court of competent jurisdiction is conclusive in all subsequent actions between the same parties or their privies as to all matters raised, or which could have been raised, in the former proceedings. *DePratt v. West Bend Mutual Ins. Co.*, 113 Wis.2d 306, 310–11, 334 N.W.2d 883, 885 (1983). A claim can be barred even though the plaintiff seeks remedies or

---

**3.** The complaint originally contained six counts. Counts III and V alleged that Jean Gross and Ronald Panke conspired with the City and Benz to deprive the plaintiffs of their constitutional rights. These counts were dismissed upon stipulation of the parties.

forms of relief that were not demanded in the former action. *Id.* at 312, 334 N.W.2d at 886; *Landess v. Schmidt,* 115 Wis.2d 186, 192, 340 N.W.2d 213, 216 (App.1983); *Patzer v. Board of Regents,* 763 F.2d 851, 855 (7th Cir.1985). Accordingly, in order for the Wisconsin proceedings to bar the current action, there must be: 1) a final judgment on the merits in the state action; 2) an identity of the cause of action in the state proceedings and this suit; and 3) an identity of parties or their privies in the two suits. *DePratt,* 113 Wis.2d at 311, 334 N.W.2d at 885. Wisconsin has adopted a transactional approach to determining whether two suits involve the same cause of action. *Id.* at 311–12, 334 N.W.2d at 886 (citing *Restatement (Second) of Judgments* § 24, comment a (1982)). "[I]f both suits arise from the same transaction, incident or factual situation, *res judicata* generally will bar the second suit." *Krison,* 767 F.2d at 349 (quoting *Hagee v. City of Evanston,* 729 F.2d 510, 513 (7th Cir.1984)).

▇▇▇ It is undisputed that the parties here are the same as the parties in the state court proceedings and that final judgments on the merits were entered by the state courts. It is also clear that the transactions are the same because the present claims for declaratory, injunctive, and monetary relief arise from the very fact of the state court proceedings. The unconstitutionality of an ordinance is an affirmative defense that can be raised in a Wisconsin circuit court. In fact, John Pliska raised the defense that § 21.03(11) of the Code was unconstitutionally vague in his 1984 prosecution. That defense was unsuccessful and he did not appeal. Wisconsin law holds that a party may not attack a final judgment in a collateral proceeding by bringing a claim that would have constituted a potential defense in the prior action. *Vandenplas,* 753 F.2d at 559 (citing *Conway v. Division of Conservation, Dept. of Natural Resources,* 50 Wis.2d 152, 158–59, 183 N.W.2d 77, 81 (1971)). A Wisconsin circuit court judgment is *res judicata* if no appeal is taken. *Kriesel v. Kriesel,* 35 Wis.2d 134, 138, 150 N.W.2d 416, 418 (1967). Since all of the challenges to the facial validity of the ordinances were or

could have been presented to the circuit court, the district court correctly found those claims barred by *res judicata.*

Nevertheless, the Pliskas contend that this § 1983 action is fundamentally different from the state court proceedings because here they challenge the validity of the current ordinances, not the ordinances they were prosecuted under in 1979, 1981 and 1984. We reject this argument. The current ordinances provide:

21.03(9) No owner or occupant of a premise or premise unit shall accumulate rubbish, boxes, lumber, scrap metal, appliance, or any other material in such a manner that may be unsightly to, incompatible with, or repugnant to neighboring residential or commercial premises.

21.03(10) No person shall store, place or allow conditions or materials that may serve as food or harborage for rodents or insects or store, place, or allow any health nuisance, source of filth, or cause of sickness. No person shall suffer, permit or allow vegetative matter, which may provide harborage for rodents or insects or which may conceal filthy deposits or be unsightly to, incompatible with, or repugnant to neighboring residential or commercial premises.

It is clear that the current ordinances are not materially different from those under which the Pliskas were prosecuted.

The Pliskas also assert that they did not have a full and fair opportunity to litigate their constitutional challenges to the validity of the ordinances in the state court actions. They allege that they did not have sufficient incentive to litigate their claims until they were threatened with serial prosecution and daily fines of up to $100.00 at the conclusion of the 1984 prosecution. We believe that the Pliskas had every incentive to litigate their constitutional challenges in state court. The complaints issued against them in the earlier proceedings informed them that § 21.14 of the Code provided for a maximum fine of $100.00 or ten days in jail for every day that a violation of the ordinance existed. The possibility of daily fines existed in the prior prosecutions. Insofar as the Pliskas complain about the

threat of serial prosecution, they were given the opportunity to prove that claim below and chose to abandon it.

The procedures and avenues for relief available to the Pliskas in the Wisconsin state courts afforded them a full and fair opportunity to litigate their constitutional defenses. The Wisconsin judgments are thus entitled to full faith and credit under § 1738.

### III.

We also reject John Pliska's argument that the district court erred in denying his motion for a directed verdict on his illegal stop and arrest claims. In reviewing a district court's denial of a motion for a directed verdict, the standard to be applied by this court is the same as that applied by the trial court. *Panter v. Marshall Field & Co.*, 646 F.2d 271, 281 (7th Cir.), *cert. denied*, 454 U.S. 1092, 102 S.Ct. 658, 70 L.Ed.2d 631 (1981). A motion for a directed verdict is properly denied where the evidence, along with inferences to be reasonably drawn therefrom, is sufficient to support the verdict, when viewed in the light most favorable to the party opposing the motion. *Webb v. City of Chester*, 813 F.2d 824, 828 (7th Cir.1987); *Tice v. Lambert Yards, Inc.*, 761 F.2d 1210, 1213 (7th Cir.1985). If reasonable men in the fair and impartial exercise of their judgment could differ on the conclusions to be drawn from the evidence, the case must go to the jury. *Bergren v. City of Milwaukee*, 811 F.2d 1139, 1141–42 (7th Cir.1987). "The district judge does not resolve conflicts in the testimony or weigh and evaluate the evidence. Those functions are reserved to the factfinder." *Webb*, 813 F.2d at 828. With these standards in mind, we review the facts presented to the jury.

In the middle of the afternoon on June 11, 1984, John Pliska, a sixty-one-year old white man, was walking down Jannick Circle, a residential street in Stevens Point. Periodically, he paused to look carefully at the houses on the circle and write something down in a book.

Jean Gross and Patricia Redding were having coffee inside Gross' home. Gross was a recent widow, living alone, and Redding had a seven-year old daughter living with her. In the past two years, the neighborhood had been burglarized twice during the day, and about six months earlier, an outboard motor had been taken from a boat parked in Gross' driveway.

Gross glanced out her window and saw Pliska standing on the circle in front of her property, looking at her house and writing notes in a book. She did not know who Pliska was, but Redding said that she recognized him as the man she had seen photographing Gross' home a few weeks earlier. The women were curious about his activities and so Gross went outside to find out what he was doing. As she approached him, she asked him if he was from the City. Pliska refused to tell her his name or to explain what he was doing, but instead walked quickly away from her. As Gross followed him along, he told her that he did not want to talk to her, that what he was doing was none of her business and that he was making notes on City code violations for a lawyer in Wisconsin Rapids in preparation for a suit in federal court that would involve her. She was able to see that he was holding photographs of the various residences on the circle. Pliska then told Gross that he hoped she would know how to vote "the right way" in the next City election. Meanwhile, Redding had called the police to report a suspicious person in the neighborhood.

Benz, a fourteen-year veteran of the Stevens Point Police Department, responded to a dispatcher's call by driving to Jannick Circle, interviewing Gross and Redding and learning from Gross the circumstances of her encounter with Pliska. Benz then drove around the neighborhood in search of the man they had described. At that point, he knew that an older man had been observed looking carefully at homes in the area and taking notes, that the man had a stack of photographs of houses in the area, that the man had refused to give his name or to explain much about what he was doing when Gross had asked him and that he had walked away from her. He knew that the neighborhood had been burglar-

ized at least twice within the past two years. He had also investigated the earlier theft of the outboard motor from Gross' driveway. Benz suspected that the man might be "casing" the neighborhood prior to committing additional burglaries.

Benz testified that he drove around the neighborhood, spotted a man fitting Gross' description, Pliska, in a wooded area near Jannick Circle and pulled up his squad car alongside him. He then parked the car and motioned to Pliska that he wanted to speak with him. When Pliska continued to walk quickly past the squad car and told Benz to "go to hell" and that he "had nothing to say to [him], Benz radioed for assistance." Benz picked up his baton, walked up to Pliska and stood in front of him, asking him for identification. Pliska refused to identify himself or answer Benz's questions. After Pliska refused to identify himself three or four times, Benz told Pliska to sit in the squad car until Benz could determine his identity. Benz then escorted Pliska to the back seat of the squad car, putting his hand on Pliska's shoulder to direct him to the car. The rear doors of the car could not be opened from the inside. Pliska was not frisked or handcuffed. Benz did not grab Pliska, treat him roughly or threaten him with a weapon.

As Benz got into the front seat of the squad car, he noticed a red car nearby. He drove over to it, and asked Pliska whether the car was his. When Benz learned that the car did belong to Pliska, he radioed the police department for a license check. Although the license check revealed that the car was registered in the name of John Pliska, Pliska refused to say whether that was his name. About that time, Benz learned that Detective Engebretson was approaching and he cancelled the earlier call for assistance. When Engebretson arrived, he recognized Pliska immediately and told Benz that Pliska was a lifelong resident of Stevens Point. At that point, Benz opened the rear door of the squad car and let Pliska out. Benz and Engebretson then went back to Gross' home to report what had happened and to try to reassure Gross and Redding. Benz assumed that Pliska had driven away, although he did not see him do so. The entire incident lasted less than ten minutes from the time Benz encountered Pliska until he released him from the squad car.

At the conclusion of the evidence, Pliska moved for a directed verdict on the issues of whether he was detained illegally for an investigative stop and whether Benz had placed him under arrest. The district court reserved a ruling on the motion and allowed the case to go to the jury. The jury was directed to answer a special verdict of four questions. The first two questions were:

> *Question No. 1:* When defendant Benz stopped plaintiff on June 11, 1984 to ask him to identify himself and explain what he was doing in the area, was defendant Benz acting without adequate grounds for a reasonable suspicion that plaintiff had committed, was committing, or was about to commit a criminal offense?
>
> *Question No. 2:* Were defendant Benz's subsequent actions and statements such as to have caused a reasonable person in the same situation as plaintiff reasonably to believe he was under arrest?

The jury answered no to both questions and therefore did not answer the last two questions on damages. The district court subsequently denied the motion for a directed verdict and a judgment for Benz was entered on the verdicts.

## IV.

 The Supreme Court has long recognized that not all police contacts with individuals are deemed seizures within the meaning of the Fourth Amendment. *See, e.g., Florida v. Royer,* 460 U.S. 491, 501, 103 S.Ct. 1319, 1326, 75 L.Ed.2d 229 (1983) (officers do not violate the Fourth Amendment merely by approaching an individual in the street or in another public place, asking if the person is willing to answer some questions and putting questions to him if he is willing to listen; such an encounter is consensual in nature and without Fourth Amendment implications; asking for and examining suspect's ticket and driver's license did not constitute a seizure); *United States v. Mendenhall,* 446 U.S. 544,

555, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980) (opinion of Stewart, J.) (suspect not seized "simply by reason of the fact that the agents approached her, asked her if she would show them identification, and posed to her a few questions"). This court applies an objective test in determining whether an individual has been seized. *United States v. Pavelski*, 789 F.2d 485, 488 (7th Cir.), *cert. denied,* — U.S. —, 107 S.Ct. 322, 93 L.Ed.2d 295 (1986). An individual has been seized only if, considering all of the circumstances, a reasonable person would have believed that his freedom of movement was restrained, or that he did not remain at liberty to disregard a police officer's request for information. *Mendenhall*, 446 U.S. at 554–55, 100 S.Ct. at 1877; *United States v. Black*, 675 F.2d 129, 133–34 (7th Cir.1982), *cert. denied,* 460 U.S. 1068, 103 S.Ct. 1520, 75 L.Ed.2d 945 (1983). *See also Terry v. Ohio*, 392 U.S. 1, 16, 88 S.Ct. 1868, 1877, 20 L.Ed.2d 889 (1968); *United States v. Borys*, 766 F.2d 304, 308 (7th Cir.1985), *cert. denied,* — U.S. —, 106 S.Ct. 852, 88 L.Ed.2d 893 (1986). In this case, all of the circumstances indicate that from the time at which Benz initially stopped Pliska, to the point that he ordered him into the squad car, a reasonable person would have believed that he was free to walk away from Benz, or at least refuse to answer his questions. *See Borys*, 766 F.2d at 310 (no seizure where police questioned suspect with his consent, did not delay or alter suspect's movement around the terminal, and asked suspect for his identification and airline ticket); *United States v. Palen*, 793 F.2d 853, 856–57 (7th Cir.1986) (same). Accordingly, Benz did not need to justify his initial approach and questioning of Pliska because no Fourth Amendment interest was implicated.

█ Once Benz ordered Pliska into the squad car, however, there was a seizure within the meaning of the Fourth Amendment. Nevertheless, "[t]he Fourth Amendment is not ... a guarantee against *all* searches and seizures, but only against *unreasonable* searches and seizures." *United States v. Sharpe*, 470 U.S. 675, 682, 105 S.Ct. 1568, 1573, 84 L.Ed.2d 605 (1985) (emphasis in original). Before we can determine the reasonableness of the seizure, we must first decide whether the jury properly concluded that the seizure was an investigatory stop requiring a reasonable suspicion of criminal activity, rather than an arrest requiring probable cause. *See Black*, 675 F.2d at 132–33.

█ Pliska argues that "the locking up of John Pliska in the back seat of the prowl car indefinitely and the officer driving over to Pliska's car amounted to an arrest, without probable cause." The jury found that a reasonable person in Pliska's situation would not have believed that he was under arrest. That finding is supported by sufficient evidence to withstand a directed verdict. Among the circumstances courts consider in determining whether a detention is an investigatory stop or an arrest, are the officer's intent in stopping the individual, the length of the stop, the questions asked and the extent of any search made. *United States v. Longmire*, 761 F.2d 411, 414–15 (7th Cir.1985) (citations omitted). Here, Benz stopped Pliska to ask him his identity and what he was doing in the neighborhood. Pliska was not frisked or handcuffed and there was no show of force by Benz. Although Pliska testified that Benz told him he was under arrest, the jury apparently found this testimony unbelievable, and it was denied by Benz. The mere fact that Benz drove the squad car a short distance does not necessarily convert the stop into an arrest. *See United States v. Vanichromanee*, 742 F.2d 340, 345 (7th Cir.1984). Moreover, Pliska was detained less than ten minutes. *See Sharpe*, 470 U.S. at 683, 105 S.Ct. at 1574 (twenty minute detention constitutes a "stop" rather than a search where police acted diligently); *United States v. Place*, 462 U.S. 696, 709–10, 103 S.Ct. 2637, 2646, 77 L.Ed.2d 110 (1983) ("brevity of the invasion of the individual's Fourth Amendment interests is an important factor in determining whether the seizure is so minimally intrusive as to be justified on reasonable suspicion"). The district court's denial of the motion for a directed verdict on the arrest claim was appropriate.

█ When the police detain an individual in a manner that is not the function-

al equivalent of an arrest, the Fourth Amendment requires that the investigatory stop be reasonable under the circumstances. *See, e.g., United States v. Montoya de Hernandez,* 473 U.S. 531, 105 S.Ct. 3304, 87 L.Ed.2d 381 (1985) (reasonableness depends upon all the circumstances surrounding the search or seizure and the nature or the search or seizure itself); *Royer,* 460 U.S. at 512, 103 S.Ct. at 1332; *Terry,* 392 U.S. at 19, 88 S.Ct. at 1878. A police officer may detain a suspicious individual briefly "in order to determine his identity or to maintain the status quo momentarily while obtaining more information," *Adams v. Williams,* 407 U.S. 143, 146, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972), if the officer has knowledge of specific and articulated facts, which, along with the rational inferences from those facts, support a reasonable suspicion that the individual is involved in ongoing or contemplated criminal activity, *Terry,* 392 U.S. at 22–23, 88 S.Ct. at 1880–81; *Adams,* 407 U.S. at 146, 92 S.Ct. at 1923, or was involved in past unsolved criminal activity. *United States v. Hensley,* 469 U.S. 221, 229, 105 S.Ct. 675, 681, 83 L.Ed.2d 604 (1985). The detention must be based on more than the officer's subjective good faith, inarticulated hunches, and generalized suspicion. *Pavelski,* 789 F.2d at 489; *United States v. Denney,* 771 F.2d 318, 321 (7th Cir.1985). Nevertheless, "[a]cts which are innocent in and of themselves may take on more significance when considered together ..." and certain conduct may take on added meaning to "experienced officers trained in the arts of observation and crime detection and acquainted with the operating modes of criminals." *United States v. Jones,* 759 F.2d 633, 642 (8th Cir.), *cert. denied,* 474 U.S. 837, 106 S.Ct. 113, 88 L.Ed.2d 92 (1985). Although the scope of the intrusion permitted will vary from case to case, it must be temporary and last no longer than is necessary to effectuate the purpose of the stop and "the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Borys,* 766 F.2d at 308 (quoting *Royer,* 460 U.S. at 500, 103 S.Ct. at 1325); *see also*

*United States v. Davies,* 768 F.2d 893, 901 (7th Cir.), *cert. denied,* 474 U.S. 1008, 106 S.Ct. 533, 88 L.Ed.2d 464 (1985).

██ Pliska contends that Benz lacked reasonable suspicion to detain him as a matter of law and that therefore his motion for a directed verdict should have been granted. We do not agree. The jury was presented with two conflicting versions of the incident between Pliska and Benz and was forced to decide between them. Where reasonable men may draw different conclusions from the evidence, the question is not one of law but of fact to be settled by the jury. *Best v. District of Columbia,* 291 U.S. 411, 415, 54 S.Ct. 487, 489, 78 L.Ed. 882 (1934). *Cf. Llaguno v. Mingey,* 763 F.2d 1560, 1565 (7th Cir.1985) (en banc) (the existence of probable cause is a question for the jury if there is a room for a difference of opinion); *Moore v. Marketplace Restaurant,* 754 F.2d 1336, 1346–47 (7th Cir.1985) (same).

The jury found that Benz possessed sufficient specific articulable facts to sustain a reasonable belief that Pliska could be involved in criminal activity. There is sufficient evidence to support that finding. At the time of the detention, Benz knew that Pliska had been seen walking slowly through a residential area writing on photographs of area homes which he had taken a few weeks earlier. He knew that Pliska had been hostile and evasive when Gross questioned him and that he had refused to identify himself or give a satisfactory explanation for his photographing and notetaking. He also knew that there had been a theft at Gross' house and the neighborhood had been burglarized before. Pliska's refusal to identify himself and his behavior upon Benz's arrival provided further objective grounds for suspecting that Pliska was involved in criminal activity. *See Sibron v. New York,* 392 U.S. 40, 66, 88 S.Ct. 1889, 1904, 20 L.Ed.2d 917 (1968) ("deliberately furtive actions and flight at approach of strangers or law officers are strong indicia of *mens rea* ..."). The jury could properly conclude that Benz had sufficient facts on which to base a reasonable suspicion that Pliska was planning a burglary, there-

by justifying the minimal intrusion on his liberty interest.

 We are also satisfied that the detention was properly limited in scope and duration. Pliska was detained for the sole purpose of verifying or dispelling Benz's suspicion that Pliska was planning a burglary. Such verification represents a substantial and legitimate government interest. *See Terry*, 392 U.S. at 22–23, 88 S.Ct. at 1880–81. Pliska was merely held long enough to determine his identity and the entire incident, from the time Benz encountered Pliska until he released him from the squad car, lasted less than ten minutes.

The judgments of the district court are AFFIRMED.