**UNITED STATES of America, Plaintiff–Appellant,**

v.

**Wayne E. GLENNA, Defendant–Appellee.**

**No. 89–1044.**

United States Court of Appeals, Seventh Circuit.

Argued May 15, 1989.

Decided June 20, 1989.

As Corrected June 26, 1989.

---

HAVE $100,000 IN CASH WITH HIM. HE IS MALE WHITE AGE APPROX 20'S 509–511 135–150. BLOND SHOULDER LENGTH HAIR AND WAS LAST SEEN IN ORANGE T–SHIRT AND KHAKI GREEN PANTS. HE WAS DRIVING GREEN DODGE WINDNOW [sic] VAN WITH NO LICENSE PLATE, MOTORCYCLE STRAPPED TO BACK OF VAN. GLENNA IS IN POSSESSION OF SEVERAL SMALL ARMED WEAPONS AND EXPLOSIVE DEVICE, HE COULD HAVE A JOB WASHING DISHES. UNKNOWN WHERE.

The Eau Claire department's night patrol shift learned of the teletype that night; the day patrol and detective bureau shifts learned of it the following morning.

At about 10 a.m. on August 23, Sergeant Judy Streets observed a van matching the description given in teletype parked in front of a residence on a busy Eau Claire thoroughfare. Streets returned to police headquarters and revealed her discovery to Captain Malone, who directed Officer Todd Trapp to keep an eye on the residence and the van from a distance. At or shortly after noon, Officer Todd Tollefson relieved Trapp who, as he departed, drove past the residence and observed in the front yard a person also matching the description in the teletype. Trapp reported this observation over his radio.

Shortly after Trapp's departure, Tollefson reported by radio that the van had left the residence and was traveling south on the busy thoroughfare. Upon receiving instructions to stop the van for failure to display license plates, Tollefson followed the van into a gas station/convenience store and parked his car. By the time Tollefson got out of his car, however, the van, which was parked near the gas pumps, was unoccupied. Tollefson, therefore, headed toward the store's entrance, where he encountered Glenna who, when asked, told Tollefson that the van was his. As Tollefson and Glenna began walking toward the van, Tollefson asked whether Glenna had registration documents for the van. Glenna responded that he had proof

Mark A. Cameli, Asst. U.S. Atty., Office of U.S. Atty., Madison, Wis., for plaintiff-appellant.

Steven C. Underwood, Murphy & Desmond, Madison, Wis., for defendant-appellee.

Before BAUER, Chief Judge, CUMMINGS, and FLAUM, Circuit Judges.

BAUER, Chief Judge.

At 9:39 p.m. on August 22, 1988, the Eau Claire, Wisconsin Police Department received this teletyped message from the Indiana State Police in LaFayette, Indiana:

FOR YOUR INFORMATION ... NO CHARGES OUR DEPARTMENT ... REF/WAYNE GLENNA ONE OF OUR TROOPERS WAS CONTACTED BY A MEMBER OF THIS SUBJECTS [sic] FAMILY ADVISING THAT GLENNA WAS PASSING THROUGH LAFAYETTE, IN[.] ENROUTE TO WAUKESHA, WI. WE NOW HAVE INFORMATION HE IS ENROUTE TO EAUCLAIRE [sic], WI TO A RELATIVES [sic] RESIDENCE BY NAME OF VEELEY. HE RESIDES IN ALABAMA AND POSSIBLY INVOLVED IN SOME TYPE OF DRUG DEAL AND COULD

of application for title in the van's glove compartment.

About eight to ten feet from the van, Tollefson stopped and asked Glenna for some identification. As Glenna reached into a large, military-style pocket of his trousers, Tollefson saw a lump in the pocket which he thought could be a weapon. Tollefson immediately grabbed Glenna's hand and pulled from the pocket a loaded clip for a nine-millimeter firearm. Tollefson thereafter handcuffed Glenna or had Trapp, who had turned back toward the store after hearing Tollefson's radio reports, do so. Tollefson then conducted a pat-down search of Glenna and found in another pocket a small explosive "cherry bomb."

After conducting the pat-down search, Tollefson asked Glenna if he could retrieve the van's registration papers from the glove compartment. Glenna consented, so Tollefson opened the van's front passenger-side door and removed the papers. While doing so, Tollefson noticed between the van's two front bucket seats a box bearing a fireworks label. Tollefson opened the box and found illegal fireworks. After looking in other boxes and bags for fireworks or contraband and finding nothing, Tollefson exited the van and told Glenna that he was under arrest for the possession of illegal fireworks.

After radioing a driver's license and vehicle identification number check, Tollefson walked around the van and, through a window, observed a box labeled "UZI", which Tollefson recognized as a brand of automatic or semiautomatic firearm, as well the butt of a holstered handgun[1] and a knife. By now, other officers had arrived, including Streets, Investigator Matysik, and Sergeant Foster, the senior officer present. After learning from Tollefson what had happened, Foster, who also observed the UZI box and the revolver butt, instructed Trapp to place Glenna in Tollefson's squad car and to ask Glenna whether the van contained any bombs. Trapp did so and eventually Glenna responded that there was a bomb in a suitcase behind the driver

seat, but that Trapp should not worry because it was not activated.

Unconvinced, the officers called the fire department and requested that they bring a "bomb box" to the scene. Soon after, Foster, assisted by a fire department supervisor and without Glenna's consent, entered the van and, while kneeling on the front seat facing the rear, opened the suitcase in the second seat. Observing what appeared to be a pipe bomb inside, Foster immediately closed the suitcase. The bomb was then placed in the bomb box, and transported by the fire department to the police department range pending the arrival of a bomb disposal team. The van was towed to the same range out of concern that it might contain more explosives. Meanwhile, Tollefson and Matysik took Glenna back to police headquarters, where they arrived at approximately 12:30 p.m.

On August 24, Glenna was indicted by the grand jury for the unlawful possession of an unregistered pipe bomb, the possession of a pipe bomb not identified by a serial number, and the interstate transportation of an unregistered pipe bomb, all in violation of 26 U.S.C. § 5861(d), (i), and (j), and 26 U.S.C. § 5871. He later moved to suppress all statements and the fruits of all searches of his van following his stop and detention on the afternoon of August 23. Glenna contended, *inter alia*, that he was arrested without probable cause when the officers placed him in handcuffs in the convenience store parking lot; that his alleged authorization of Tollefson's entry into the van to retrieve the registration papers was invalid because Tollefson requested Glenna's consent to search without first advising Glenna of his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); and that, under *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), all subsequent statements and the products of any subsequent searches had to be suppressed as tainted fruit of these prior illegalities.

The magistrate, after a two-day evidentiary hearing, recommended that Glenna's

---

1. This turned out to be a cap gun.

motion be granted except as to the nine-millimeter clip and any statements made before Glenna was handcuffed. At that point, the magistrate concluded, the limited intrusion contemplated by *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), had ended and Glenna had been arrested [2] without probable cause. The Magistrate also determined that Tollefson violated Glenna's Fifth Amendment rights when he elicited Glenna's consent to enter the van before reading him his rights under *Miranda*. The magistrate noted that *Miranda* applies to custodial interrogations, and concluded that a person in handcuffs is "manifestly" in custody. Further, the magistrate concluded that, under *Wong Sun*, neither the registration documents nor the box of fireworks found in the van's cabin were admissible in evidence, and that Glenna's arrest for possession of those fireworks was likewise unlawful. He also determined that *Wong Sun* precluded the admission of all subsequent statements and the products of all later searches.

The district court agreed with the magistrate that "there is little dispute that handcuffing a suspect converts the stop into an arrest." The court also agreed that Tollef-

son's elicitation of Glenna's consent [3] to enter the van to retrieve the registration documents without first reading Glenna his *Miranda* warnings violated Glenna's Fifth Amendment rights on the ground that Tollefson's inquiry was "reasonably likely to invoke an incriminating response." *See Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297 (1980).[4] Finally, the court agreed with the magistrate that, under *Wong Sun*, the fruits of Glenna's subsequent questioning and the searches of his van had to be suppressed. Accordingly, the court granted Glenna's motion to suppress except as to the nine millimeter clip and any of Glenna's statements uttered before he was placed in handcuffs.

This is the government's appeal from the district court's order granting Glenna's suppression motion. Not surprisingly, it argues that the district court erred in holding that the officers arrested Glenna without probable cause when they placed him in handcuffs and that Tollefson was required to read Glenna *Miranda* warnings before obtaining his consent to retrieve the registration papers. We agree with the government on both points.

---

**2.** According to the magistrate, "[t]hat handcuffs are restraints on freedom of movement of the type normally associated with arrest is too obvious to require discussion." (Citing *United States v. Hocking*, 860 F.2d 769 (7th Cir.1988).)

**3.** Apparently, the district court refused to adopt the magistrate's specific finding that Glenna did, in fact, authorize Tollefson to enter the van and retrieve the registration documents. Although the court recognized that "[t]he issue turns completely on the credibility of the witnesses" and that "[t]he magistrate found the officers more credible than the defendant," it nevertheless ruled that "[b]ecause the standard of review of the magistrate's Report and Recommendation is *de novo* ... it would probably be necessary to hold a second evidentiary hearing on this issue in order to resolve it." Because the district court agreed with the magistrate that defendant was arrested unlawfully and that all the fruits of the subsequent interrogation and searches therefore had to be suppressed, the court saw no reason to resolve the factual question in its order granting most of Glenna's suppression motion. According to the court, "[w]hether [Glenna] gave a voluntary consent to Officer Tollefson to enter the van and look for the registration papers becomes relevant only if the

court of appeals were to overturn the conclusion that the arrest was illegal. If that happens, an evidentiary hearing can be held."

**4.** According to the district court,

[o]nce [Glenna] was arrested, it was incumbent upon the officers to administer *Miranda* warnings to him before asking him any questions. Their failure to do so renders invalid any answers [Glenna] gave to questions "reasonably likely to invoke an incriminating response." *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S.Ct. 1682, 1690, 64 L.Ed.2d 297 (1980).... In view of what the officers knew in advance from the teletype (that [Glenna] was in possession of several small armed weapons and an explosive device), the government's argument [that the officers would not have expected their request for consent to retrieve the registration papers from [Glenna's] van to elicit an incriminating response] can only be termed disingenuous. [Glenna] had incriminating items in his van that the government now contends were in plain view. Allowing the officers to enter the van to view those items was likely to incriminate the defendant, and the officers had good reason to suppose that it would.

The *Miranda* issue requires little discussion, for although the district court believed that the officers' request for consent to retrieve the registration papers was "reasonably likely to evoke an incriminating response" and therefore ran afoul of *Miranda,* every federal circuit court that has addressed the question has reached the opposite conclusion. *See Cody v. Solem,* 755 F.2d 1323, 1330 (8th Cir.) ("Simply put, a consent to search is not an incriminating statement."), *cert. denied,* 474 U.S. 833, 106 S.Ct. 104, 88 L.Ed.2d 84 (1985); *Smith v. Wainright,* 581 F.2d 1149, 1152 (5th Cir. 1978) ("A consent to search is not a self-incriminating statement."); *United States v. Lemon,* 550 F.2d 467, 472 (9th Cir.1977) ("A consent to search is not the type of incriminating statement toward which the fifth amendment is directed. It is not in itself 'evidence of a testimonial or communicative nature.' "); *United States v. Far- uolo,* 506 F.2d 490, 495 (2d Cir.1974) ("There is no possible violation of fifth amendment rights since the consent to search is not 'evidence of a testimonial or communicative nature.' "). Without belaboring the point, we agree with our fellow courts of appeal.

The government's first contention, on the other hand, requires us to explore the outer limits of *Terry,* in which the Supreme Court "for the first time recognized an exception to the requirement that Fourth Amendment seizures of persons must be based on probable cause," *Dunaway v. New York,* 442 U.S. 200, 208–09, 99 S.Ct. 2248, 2254–55, 60 L.Ed.2d 824 (1979), and established "a narrowly drawn authority to permit a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime." *Terry,* 392 U.S. at 27, 88 S.Ct. at 1883. The Court did so because of "the need for law enforcement officers to protect themselves and other prospective victims of violence in situations where they may lack probable cause for arrest." *Id.* at 24, 88 S.Ct. at 1881. As the Court stated,

[w]hen an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others, it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm.

*Id.*

Unfortunately, but not surprisingly, there is no brightline test for distinguishing between a lawful *Terry* stop and an illegal arrest, *see United States v. Serna- Barreto,* 842 F.2d 965, 967 (7th Cir.1988); *United States v. Sharpe,* 470 U.S. 675, 685–86, 105 S.Ct. 1568, 1574–76, 84 L.Ed.2d 605 (1985), for such a test "would undermine the ... important need to allow authorities to graduate their responses to the demands of any particular situation." *Sharpe,* 470 U.S. at 686, 105 S.Ct. at 1575 (quoting *United States v. Place,* 462 U.S. 696, 709 n. 10, 103 S.Ct. 2637, 2646 n. 10, 77 L.Ed.2d 110 (1983)). Instead, in evaluating the reasonableness of an investigative stop, we examine first whether the officers' action was justified at its inception and, second, whether it was reasonably related in scope to the circumstances which justified the interference in the first place. *Id.,* 470 U.S. at 682, 105 S.Ct. at 1573 (citing *Terry,* 392 U.S. at 20, 88 S.Ct. at 1879).

Glenna, of course, has never questioned that Tollefson was acting within his authority when he initiated the investigative stop at the convenience store by inquiring into the registration status of the van. Nor has Glenna ever challenged Tollefson's seizure of the loaded nine-millimeter clip from his pocket. As the magistrate concluded, Tollefson's "sensitivity to the presence of a weapon had been elevated by the disquieting Teletype from the Indiana State Police," and Tollefson's observance of "[t]he protrusion in [Glenna's] pocket could reasonably be seen as an ominous validation of the Teletype." Tollefson's seizure of the clip, therefore, was precisely the type of reasonably graduated response to the demands of a particular situation that the Court countenanced in *Sharpe* and *Place,*

*supra.* Whether what followed—the officers' placing of Glenna in handcuffs—also was a reasonably graduated response to the demands of the situation depends on whether the restraint was temporary and lasted no longer than was necessary to effectuate the purpose of the stop, and whether the methods employed were the least intrusive means reasonably available to verify or dispel the officers suspicion in a short period of time. *Pliska v. City of Stevens Point,* 823 F.2d 1168, 1177 (7th Cir.1987) (citing additional cases); *United States v. Boden,* 854 F.2d 983, 993 (7th Cir.1988).

Notably, two other circuits have held that placing a suspect in handcuffs may fall within the bounds of *Terry.* In *United States v. Kapperman,* 764 F.2d 786, 790 n. 4 (11th Cir.1985), the Eleventh Circuit held that

> neither handcuffing nor other restraints will *automatically* convert a *Terry* stop into a *de facto* arrest requiring probable cause. Just as probable cause to arrest will not justify using excessive force to detain a suspect, the use of a particular method to restrain a person's freedom of movement does not necessarily make police action tantamount to an arrest. The inquiry in either context is reasonableness.

Similarly, in *United States v. Taylor,* 716 F.2d 701, 709 (9th Cir.1983), the Ninth Circuit held that "the use of handcuffs, if reasonably necessary, while substantially aggravating the intrusiveness of an investigatory stop, do [sic] not necessarily convert a *Terry* stop into an arrest necessitating probable cause."

Moreover, we too have held that restraints rivaling the use of handcuffs in terms of their severity may fall within the scope of a *Terry* investigatory stop. For example, in *Pliska,* 823 F.2d at 1178, we held that *Terry* countenanced the placing of a burglary suspect in a police squad car during an investigative stop. In doing so, we reasoned that the suspect, Pliska,

> was detained for the sole purpose of verifying or dispelling [Officer] Benz's

suspicion that Pliska was planning a burglary. Such verification represents a substantial and legitimate government interest. Pliska was merely held long enough to determine his identity in the entire incident, from the time Benz encountered Pliska until he released him from the squad car, lasted less than ten minutes.

*Id.* Similarly, we held in *Serna–Barreto,* 842 F.2d at 968, that the holding of a suspect at gunpoint during the course of an investigative stop was reasonable under *Terry.* There, we stated that

> [a]lthough we are troubled by the thought of allowing policemen to stop people at the point of a gun when probable cause to arrest is lacking, we are unwilling to hold that an investigative stop is never lawful when it can be effectuated safely only in that manner. It is not nice to have a gun pointed at you by a policeman but it is worse to have a gun pointed at you by a criminal, so there is a complex tradeoff involved in any proposal to reduce (or increase) the permissible scope of investigatory stops.

*Id.*

■ Of course, we agree with the Ninth Circuit that the use of handcuffs substantially aggravates the intrusiveness of a *Terry* stop. We also agree with the magistrate below that handcuffs are restraints on freedom of movement *normally* associated with arrest. Clearly, the thought of allowing police officers to handcuff persons when probable cause to arrest is lacking is a troubling one. Nevertheless, we are unwilling to hold that under *Terry,* the placing of a suspect in handcuffs without probable cause to arrest is *always* unlawful. If, in a rare case, "common sense and ordinary human experience" convince us that an officer believed reasonably that an investigative stop could be effectuated safely only in this manner, *see Sharpe,* 470 U.S. at 685, 105 S.Ct. at 1574, "we will not substitute our judgment for that of the officers as to the best methods to investi-

gate." *See Boden,* 854 F.2d at 993.[5]

Although it is a close one, this is, in our view, such a case. Here, officers Tollefson and Trapp both were aware of the teletype message from the Indiana State Police concerning Glenna. That Teletype, which cited information received from a member of Glenna's own family, indicated that Glenna (1) was driving a van bearing no license plates; (2) possibly was involved in a drug deal; (3) could be carrying $100,000 in cash; (4) was in possession of *several* small armed weapons; and, last but not least, was in possession of an explosive device. This information provided the basis for a reasonable belief that Glenna was armed and dangerous. Tollefson's discovery of the loaded clip, of course, only enhanced the credibility of the teletype's portrayal of Glenna as a well-armed and potentially dangerous individual. As the magistrate found, Tollefson was aware that persons carrying a weapon often carry spare clips. And it was only then that Tollefson and Trapp placed Glenna in handcuffs in order, as Tollefson testified, to preserve their own safety. Tollefson immediately conducted a pat-down search of Glenna for weapons. Although the pat-down yielded no firearms, it did yield a small, explosive "cherry bomb," which, of course, also corroborated the teletype warning that Glenna was in possession of explosives.

At this point, Tollefson had a loaded clip, a cherry bomb, and a reasonable suspicion that Glenna possessed firearms and/or explosives in his van, which happened to be parked next to gasoline pumps. On the other hand, Tollefson had yet to obtain from Glenna any identification and the van's registration papers. Tollefson, therefore, decided not to remove the handcuffs just yet, but to ask Glenna for permission to enter the van and retrieve the registration papers. When Glenna consented, Tollefson entered the van and discovered in plain view the box labeled "fireworks."

Upon opening the box and observing its contents, Tollefson had probable cause to arrest Glenna for possession of illegal fireworks, which he promptly did.

This is not, in our view, conduct beyond the limits of that contemplated in *Terry.* None of the safeguards taken by the officers in this sequence of events strikes us as unreasonable or out of proportion in relation to the danger posed by the investigatory stop as the officers perceived it. Under the specific circumstances of this case, we simply cannot secondguess the officers' belief that, in order to safely effectuate the stop and confirm or dispel their suspicion that Glenna was committing a crime, they had to place Glenna in handcuffs. Moreover, the amount of time Glenna spent in handcuffs in the absence of probable cause for arrest was minimal—no longer than ten or fifteen minutes. Consequently, we conclude that the district court erred in holding that the officers' handcuffing of Glenna transformed their investigative stop into an unlawful arrest.

Thus, because of our two rulings in this opinion, none of the grounds upon which the district court granted Glenna's suppression motion remain. We therefore reverse the district court's order granting Glenna's suppression motion and remand the case to the district court for further proceedings consistent with this opinion.

REVERSED AND REMANDED.

FLAUM, Circuit Judge, dissenting.

This case involves the delicate and difficult question of whether the use of handcuffs by police officers transforms an investigatory stop into an arrest requiring probable cause. I agree with the majority that there are limited circumstances where handcuffs can reasonably be utilized in the course of an investigatory stop. Unlike the majority, however, I believe that the particular use of the handcuffs in this case indi-

---

5. As we emphasized in *Boden,* and [a]s the Supreme Court emphasized in [*Michigan v. Long,* 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983)], a *Terry* investigation " 'at close range' " requires an officer to "make a 'quick decision as to how to protect himself and others from possible danger....' " Therefore, officers are not required to "adopt alternative means to ensure their safety in order to avoid the intrusion involved in a *Terry* encounter." *Id.* at 994 (citations omitted).

cates that the officers exceeded the scope of an investigative stop and that the defendant was arrested. Because it is undisputed that the police did not have probable cause to believe the defendant had committed a crime at the time I find he was arrested, I would hold that the arrest was illegal and that the district court was correct in suppressing the fruits of that illegal arrest.

## I.

In *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the Supreme Court held that police officers may, without probable cause, stop a citizen in order to investigate a crime so long as the police officer has a reasonable suspicion that the citizen was involved in a crime. The Court also held that if the officer reasonably believes that the encounter will endanger his or her safety or the safety of others, then he or she may undertake a reasonable search for weapons. *Id.* at 27, 88 S.Ct. at 1883. The Court emphasized that "[t]he manner in which the seizure and search [are] conducted is, of course, [a] vital ... part of the inquiry...." *Id.* at 28, 88 S.Ct. at 1883. The manner of the seizure, to be reasonable, must be carefully tailored to the purpose of the seizure. *Dunaway v. New York*, 442 U.S. 200, 209 n. 11, 99 S.Ct. 2248, 2255 n. 11, 60 L.Ed.2d 824 (1979).

The Supreme Court has not yet determined whether handcuffing a suspect in the course of a *Terry* stop is ever a reasonable manner of seizure. Nevertheless, the courts that have squarely faced the question have generally approved of the use of handcuffs during a *Terry* stop. However, those courts have invariably limited the use of handcuffs to two situations in which the manacles are deemed necessary to carrying out the purposes of the stop.[1]

First, the use of handcuffs has been approved where the handcuffs were reasonably necessary to protect the police officers' safety before or during the frisk.

*People v. Allen*, 73 N.Y.2d 378, 540 N.Y. S.2d 971, 538 N.E.2d 323 (1989); *State v. Williams*, 102 Wash.2d 733, 689 P.2d 1065, 1069 n. 2 (1984) (en banc); *see also United States v. Bautista*, 684 F.2d 1286, 1289–90 (9th Cir.1982) (use of handcuffs did not convert *Terry* stop into an arrest where third armed suspect was still at large and handcuffs eliminated possibility of assault or escape attempt); *United States v. Taylor*, 716 F.2d 701 (9th Cir.1983) (handcuffs used where suspect made furtive movements with his hands after refusing an order to put his hands in the air).

In *Allen*, police officers had spotted four men that they had reason to suspect were involved in a recent armed robbery. As the police approached, the suspects scattered in different directions. One of the officers followed a suspect into a dark alley where the suspect was apprehended attempting to scale a wall. The suspect was then handcuffed and brought into a brighter area for questioning, at which time he admitted to the crime. At trial, the defendant alleged that by handcuffing him, the police had illegally arrested him without probable cause and asked for suppression of his admission as the fruit of the illegal arrest.

The New York Court of Appeals held that the use of handcuffs in this situation did not turn the *Terry* stop into an arrest: "the police officers were entitled to handcuff defendant to effect his nonarrest detention in order to ensure their own safety while they removed him to a more suitable location to pat him down for weapons." The court noted, however, that one factor in determining the reasonableness of the use of handcuffs is the amount of time in which they are utilized. In *Allen*, the handcuffing was reasonable because it did not "involve the unnecessary, prolonged handcuffing of a suspect detained on reasonable suspicion after the threat justifying the use of the handcuffs had been neutralized."

---

1. Where those two situations are not present courts have generally held that handcuffing is not a permissible element of a *Terry* stop but turn that stop into an arrest. *People v. Gabbard,*

78 Ill.2d 88, 34 Ill.Dec. 751, 753, 398 N.E.2d 574, 576 (1979); *State v. Williams*, 102 Wash.2d 733, 689 P.2d 1065, 1069 (1984) (en banc).

Second, handcuff use has been permitted in the context of a *Terry* stop where the suspect had previously attempted to evade the questioning by police officers, usually by trying to run away. *United States v. Purry,* 545 F.2d 217, 220 (D.C.Cir.1976); *State v. Aguirre,* 130 Ariz. 54, 633 P.2d 1047, 1049 (1981); *see also* 3 W. LaFave, *Search and Seizure* § 9.2 at 31 (1978) ("handcuffing of the suspect is not ordinarily proper, but yet may be resorted to when necessary to thwart the suspect's attempt 'to frustrate further inquiry' "). In *Purry,* the suspect was stopped in the vicinity of an armed bank robbery. 545 F.2d at 218–19. The suspect was handcuffed when he "turned and pulled away" as the police officer began to question him. *Id.* at 219. The appellate court approved the use of the handcuffs on those facts:

> Having lawfully stopped Purry Officer Swygert was entitled "to maintain the status quo momentarily while obtaining more information," *Adams v. Williams,* [407 U.S. 143, 146, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972) ], and ... handcuffing was an appropriate method of maintaining the status quo while further inquiry was made.

*Id.* at 220.

## II.

In this case, I agree with the majority that the use of handcuffs did not initially transform the *Terry* stop into an arrest requiring probable cause. At the time the handcuffs were placed on Glenna, the officers possessed information that Glenna may have been carrying several small weapons. That information was corroborated by the ammunition clip found in one of the pockets of the defendant. Thus, I agree that handcuffing the defendant while proceeding with the pat down was a reasonable precaution for the police officers to take to ensure their safety.

I cannot agree, however, that the officers were justified in keeping the defendant manacled once the pat down was completed. At that point, the immediate safety of the officers was no longer in jeopardy. Also, there is no evidence that the defendant was anything less than fully cooperative with the officers. Under those circumstances, the legitimate purpose of the handcuffs was no longer being served after the frisk was completed, and the continuation of the handcuffing indicates that the defendant was under arrest.

The majority, while finding it a "close call," holds that the continued handcuffing of the defendant after the pat down was not unreasonable. First, the majority states that the officers could have reasonably believed that the handcuffs were necessary to safely effect the stop and confirm or dispel their suspicions that the defendant was committing a crime. As noted above, I do not find any evidence that handcuffs were a necessary safety precaution following the pat down. No weapon was found on the defendant; the defendant was standing at least eight feet away from the van and could not have reached any weapons concealed there; and the defendant made no threatening gestures toward the police. As for the fact that the officers had not yet confirmed or denied their original suspicions, that standing alone is simply inadequate to *ever* justify the use of handcuffs in a *Terry* situation. On that rationale, handcuffs would be justified for the entirety of every *Terry* stop since, by definition, a stop is made to confirm or dispel suspicions and must end when that has been accomplished.

Second, the majority states that "the amount of time Glenna spent in handcuffs in the absence of probable cause for arrest was minimal—no longer than ten or fifteen minutes." If the handcuffs are not justified by either safety or evasion concerns, however, I believe even a momentary handcuffing constitutes an unreasonable seizure. Also, the majority's assessment of the time in handcuffs is predicated on finding that the police had probable cause to arrest Glenna after the fireworks were discovered in the van. I believe, however, that even after the fireworks were found, the police lacked probable cause to arrest Glenna.

Possession of fireworks is prohibited in Wisconsin by Wis.Stat. § 167.10(3), which

states that "[n]o person may possess or use fireworks without a user's permit from the mayor of the city...." The penalty for violation of that section is forfeiture of not more than $1000. Wis.Stat. § 167.10(9)(b) (1987–88). Conduct which carries with it the possibility only of forfeiture is *not* a criminal act, Wis.Stat. § 939.12 (1987–88), and thus an arrest is legal only if it is specifically authorized by statute. *City of Madison v. Two Crow*, 88 Wis.2d 156, 276 N.W.2d 359, 361 (App.1979).

In this case, I can find no statute which authorizes arrest for the violation of § 167.10(3)[2] and, therefore, defendant's arrest based on the possession of fireworks was an illegal arrest.[3] It follows that the police had probable cause to arrest not when the fireworks were found in the van, as found by majority, but when the pipe bomb was discovered. While it is unclear exactly how long the defendant remained in handcuffs before the pipe bomb was found, it was necessarily longer than the 10–15 minutes assumed by the majority.

In sum, I believe that on the facts of this case, the defendant was subjected to an unreasonable seizure in violation of the fourth amendment. The district court was correct to suppress the fruits of that illegal seizure. *See Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). I dissent.

**2.** It is possible that defendant's arrest was valid under a state statute which permits police to arrest based on the violation of a municipal ordinance. Wis.Stat. § 800.02(6) (1985–86). However, no evidence was presented at the suppression hearing that there is any city ordinance prohibiting the possession of the fireworks at issue in this case. Thus, the government has failed to prove that any state statute gave the police the power to arrest the defendant based on the possession of fireworks.

**3.** Of course, the illegal arrest based on the fireworks possession could be grounds in itself for suppressing evidence recovered after that arrest. I would not reach that question, however, in light of my belief that the defendant was illegally arrested when the officers failed to remove the handcuffs after the completion of the pat down.