**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Zachery Lee WILSON, Defendant–
Appellant.**

No. 92–3022.

United States Court of Appeals,
Seventh Circuit.

Argued April 1, 1993.

Decided Aug. 13, 1993.

Rehearing and Suggestion for Rehearing
En Banc Denied Oct. 8, 1993.

Gail Joy Hoffman, Office of the U.S. Atty., Milwaukee, WI (argued), for plaintiff-appellee.

Brian W. Gleason, Milwaukee, WI (argued), for defendant-appellant.

Before POSNER and RIPPLE, Circuit Judges, and TIMBERS, Senior Circuit Judge.*

---

* The Honorable William H. Timbers, Senior Circuit Judge of the United States Court of Appeals for the Second Circuit, is sitting by designation.

RIPPLE, Circuit Judge.

Following a jury trial, Zachery L. Wilson was found guilty of knowingly and intentionally possessing with intent to distribute in excess of five grams of a cocaine mixture in violation of 21 U.S.C. § 841(a)(1); with knowingly using and carrying a firearm in relation to a drug trafficking crime in violation of 18 U.S.C. § 924(c); and with being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). Prior to trial Mr. Wilson filed a motion to suppress evidence obtained from the stop and arrest made by Milwaukee police officers. After an evidentiary hearing, the magistrate judge recommended that the motion be denied and Mr. Wilson filed objections, but the district court adopted the recommendation. Following a jury trial, Mr. Wilson was found guilty on all three counts and was sentenced to 168 months on Count 1 and 120 months on Count III to run concurrently, and 60 months on Count 2 to run consecutively. Mr. Wilson now appeals the denial of his motion to suppress evidence. For the following reasons, we affirm the judgment of the district court.

## I

## BACKGROUND

At approximately 1:00 a.m. on April 9, 1992, Milwaukee police officers Bodo Gajevic and his partner David Dalland received a broadcast from Squad 710 saying that there had been some sort of incident and that Squad 710 had someone in custody.[1] The broadcast also said that the officers in Squad 710 were pursuing a suspect at 11th and Wright Street and that a brown station wagon had fled the scene and was travelling west on West Wright Street. When Officer Gajevic heard the broadcast, his squad car was located two blocks south of Wright Street and fifteen blocks east of 11th Street. The officers sped toward the scene and some

thirty seconds after hearing the broadcast saw a dark colored station wagon travelling south on North Teutonia.

Believing that this vehicle might be the station wagon to which the broadcast had referred, Officer Gajevic, in an unmarked police car and using neither siren nor lights, followed it into an alley. Once in the alley, the driver of the station wagon, who later proved to be the defendant, Zachery L. Wilson, jumped out of his moving car and fled on foot; the car came to rest against a light pole. Mr. Wilson ran for a short distance along the alley and then through some yards towards 14th Street. Officer Gajevic followed him on foot; at one point, the officer found Mr. Wilson lying down on a front porch, drew his gun, and told him to freeze, but Mr. Wilson began to run again, jumping over several fences. Officer Gajevic testified that he saw Mr. Wilson "make a motion with his arm" at a point when Mr. Wilson was confronted by Officer Gajevic and another officer, Officer Koch, who had arrived at the scene. Tr. of May 14, 1992 at 9.

Finally, Officer Gajevic located Mr. Wilson hiding under a porch and ordered him to come out. Officer Gajevic then handcuffed Mr. Wilson. When asked at the suppression hearing whether Mr. Wilson was placed under arrest at that time, Officer Gajevic said that he was.[2] Very shortly after the arrest, Officer Koch arrived and told Officer Gajevic that he had found a couple of baggies containing suspected marijuana, which Mr. Wilson had thrown away when confronted by the two officers during the chase. Officer Dalland informed Officer Gajevic, again within less than a minute of the handcuffing, that in Mr. Wilson's automobile, in plain view, were a small Raven arms .25 caliber semi-automatic handgun and a Llama .32 handgun.

Before Mr. Wilson was transported to the station, officers from Squad 710 informed Officer Gajevic that Mr. Wilson's car was not

---

1. The transcription of the radio dispatch reads:

    710: My partner's in foot pursuit, eastbound. Dispatch: 710, where are you?
    710: 11th and Wright. He's got the subject in custody. There's also a station wagon, brown in color, that went westbound from the alley. [radio noise]

    710: Those subjects are also wanted possibly; we got one [inaudible] in custody, probably wanted for some other violations here also. R.35.

2. The government made clear its position that at the time Mr. Wilson was handcuffed, he was indeed under arrest. Tr. of May 14, 1992 at 70.

the one that was the object of the broadcast. When Mr. Wilson was booked and searched at the police station, the officers found what turned out to be crack cocaine, packaging material, and a pager. At that time, he was charged only with the cocaine and firearms offenses. Mr. Wilson moved to suppress the guns found in the car and the drugs and pager found on his person after arrest.

At the evidentiary hearing held before a magistrate judge, Officer Gajevic responded affirmatively when asked whether it was a violation of law to alight from a moving vehicle. On further questioning from the court, however, the government's counsel acknowledged that the alleged violation was not the basis of the arrest. Tr. of May 14, 1992 at 14–15. The defense explored in detail the positioning of the brown station wagon in order to show that there was no basis for a reasonable suspicion that the car was the same one referred to in the broadcast. At the hearing, the magistrate judge summed up the evidence offered to show probable cause by saying that, at the arrest, the only information that the officer had was the broadcast. Only after the arrest were the marijuana and the firearms found. Tr. of May 14, 1992 at 67. The magistrate judge recommended that the motion to suppress evidence be denied because

> Officer Gajevic's observation of defendant Wilson's flight from his moving vehicle provided probable cause for his arrest for the violation of Wis. Stat. § 346.94(9) which prohibits alighting from a moving vehicle. No Fourth Amendment violation was occasioned by the defendant's arrest or the seizure of items from his person.

Report and Recommendation at 5 (E.D.Wis. May 21, 1992). The Report also stated that the plain view doctrine authorized the officers to seize, as evidence of unlawful activity, the firearms that they had observed in the automobile. *Id.*

On June 2, 1992, in open court and on the day voir dire began, the district court ruled on the defendant's objections to the Report and Recommendation. Mr. Wilson protested that the magistrate judge had articulated no nexus between the weapons and any illegal activity, and that there had been no probable cause to arrest. The district court denied the motion to suppress "for the reasons stated by the Magistrate." Tr. of June 2, 1992 at 7.

Following trial, the defense filed a motion to allow additional evidence on the subject of the moving automobile, which it had not been able to present in the evidentiary hearing.[3] The court denied the motion, stating that the evidence offered on the subject at trial had been satisfactory and credible and that there was no reason to elicit further testimony. Tr. of Aug. 18, 1992 at 4. In so doing, the court elaborated on the issue of probable cause:

> [G]iven what occurred here, police looking for an automobile involved in an automobile accident and following the Wilson car in this case into the alley, even though it was not the same car, but even if it was brought to a complete stop and the driver then got out and proceeded on to run away the police would have been justified in this case in following him ... following this individual who ran away. For the police not to have followed would have been very strange police behavior, I would think. This case, although the Magistrate chose to rest the search on the fact that the car was moving, and even by any stretch of the evidence here it was moving very slowly a person cannot jump out of an automobile that's moving very fast and start running without falling down. So this case in any view didn't turn on that point alone although the Magistrate chose to rely on that. I've adopted his recommendation.
>
> I don't think the holding even has to be that narrow. The fact that this defendant under these circumstances ran away in that alley at that time of the night justified subsequent police activity which included a chase and the more the activity intensified the more probable cause there was to con-

---

3. Mr. Wilson had located a witness to the events in the alley, who agreed to appear in court to testify on the day when the court was to rule on the magistrate judge's report. However, the witness appeared only after the ruling had been made, and he failed to comply with a subpoena the following day. R.28; Tr. of Aug. 18, 1992 at 2–3.

tinue following the defendant. As I recall it in this case the defendant was at one point confronted with a weapon and nevertheless continued and jumped the fence and continued running to a different area. So I don't think this case turned on the very small issue of whether or not the automobile was moving at perhaps a mile or two or four an hour or whether it was stopped when Wilson alighted from it.

*Id.* at 4–5.

Mr. Wilson now appeals the denial of his motion to suppress.

## II

### ANALYSIS

■ While the parties are correct that, for some time in this circuit, the proper standard of review for motions to suppress evidence was in dispute, the matter has been resolved in favor of review for clear error. *United States v. Rice*, 995 F.2d 719, 722 (7th Cir. 1993); *United States v. Spears*, 965 F.2d 262, 269 (7th Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 502, 121 L.Ed.2d 438 (1992). "[W]e give particular deference to the district court that had the opportunity to hear the testimony and observe the demeanor of the witnesses." *United States v. Edwards*, 898 F.2d 1273, 1276 (7th Cir.1990). Therefore, we review the district court's decision against a very deferential standard.

We first turn to the well-established principles governing police-citizen encounters under the Fourth Amendment. As the court recently reiterated in *United States v. Withers*, 972 F.2d 837, 841 (7th Cir.1992), "[t]hree categories delineate the extent of Fourth Amendment protections associated with police-citizen encounters." We are not concerned here with the least intrusive encounter, which is characterized by an officer approaching a citizen and seeking voluntary cooperation through non-coercive questioning. At issue here are two other types of encounters. The *Terry,* or investigative, stop is permissible if the officer has " 'specific and articulable facts sufficient to give rise to a reasonable suspicion that a person has committed or is committing a crime.' " *United States v. Adebayo*, 985 F.2d 1333, 1339 (7th

Cir.) (quoting *Withers,* 972 F.2d at 841), *cert. denied,* —— U.S. ——, 113 S.Ct. 2947, 124 L.Ed.2d 695 (1993); *see also Terry v. Ohio,* 392 U.S. 1, 21, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968). Finally, the most intrusive of the encounters is an arrest, which requires that the police have probable cause to believe that a person has committed or is committing a crime. *Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 226, 13 L.Ed.2d 142 (1964). Under the Constitution, an officer may arrest a suspect without a warrant if the officer has probable cause. *Michigan v. De-Fillippo,* 443 U.S. 31, 36, 99 S.Ct. 2627, 2631, 61 L.Ed.2d 343 (1979). Both the *Terry* stop and the arrest are "seizures" for purposes of the Fourth Amendment. *Withers,* 972 F.2d at 841.

> "Obviously, not all personal intercourse between policemen and citizens involves 'seizures' of persons. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred."

*Florida v. Bostick,* —— U.S. ——, ——, 111 S.Ct. 2382, 2386, 115 L.Ed.2d 389 (1991) (quoting *Terry,* 392 U.S. at 19 n. 16, 88 S.Ct. at 1879 n. 16).

At first glance, there appears to be a good deal of ambiguity with respect to the basis of the district court's determination that there was probable cause, at the time of the initial apprehension, for the warrantless arrest of Mr. Wilson by Officer Gajevic. The magistrate judge relied on the alleged violation of an ordinance that forbids the occupant of a moving vehicle to leave the vehicle while it is in motion. *See* Wis. Stat. § 346.94(9) (1991). In its initial consideration of the matter, the district court also relied on this rationale. When asked to revisit the matter during a post-trial motion, however, it relied on the totality of the circumstances. From our study of the record, it appears that the district court's change of position, and the resultant ambiguity, can be traced to the government's denial before the magistrate judge, a denial it has transformed to half-hearted reliance on appeal, that the ordinance was the basis for its claim of probable cause. It is not at all clear to us why the government was

reluctant to rely on the ordinance. Given this state of the record, we shall not rely on the violation of the ordinance as a justification for the officer's action, although we do not want to be misread as rejecting this basis.

Fortunately, the evidentiary hearing was lengthy and detailed and provides a firm footing for our review of the circumstances leading up to, and following, the handcuffing of Mr. Wilson.[4] We may affirm the district court's ruling on any basis that finds support in the record, "even if the district court relied on the wrong grounds or reasoning." *Small v. Endicott*, 998 F.2d 411, 414 (7th Cir.1993); *accord Helvering v. Gowran*, 302 U.S. 238, 245–46, 58 S.Ct. 154, 157–58, 82 L.Ed. 224 (1937); *United States v. Thomas*, 934 F.2d 840, 843 (7th Cir.1991).

We believe that the initial apprehension can be characterized as a valid *Terry* stop, which subsequently ripened into an arrest supported by probable cause. The *Terry* Court left no doubt that the type of encounter it envisioned was a Fourth Amendment "seizure," but that the "central inquiry under the Fourth Amendment [was] the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security." *Terry*, 392 U.S. at 19, 88 S.Ct. at 1879. This inquiry "is a dual one— whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Id.* at 20, 88 S.Ct. at 1879. The Court then set forth the now familiar reasonable suspicion standard: "the police must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Id.* at 21, 88 S.Ct. at 1880. Without doubt, reasonable suspicion is "a quantum of proof less demanding than probable cause." *Id.* at 21–22, 88 S.Ct. at 1879–80. *Terry* also made it clear that courts would rely on an objective standard in assessing whether a reasonable person in command of all the available facts would feel that the stop was

justified. *Id.* (citing *Beck*, 379 U.S. at 96–97, 85 S.Ct. at 1228–29). "The issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Terry*, 392 U.S. at 27, 88 S.Ct. at 1883. In determining whether there is reasonable suspicion for a *Terry* stop, inferences may be drawn from the officer's own experience in conjunction with the facts of which he is aware. *United States v. Boden*, 854 F.2d 983, 992 (7th Cir.1988) (citing *United States v. Borys*, 766 F.2d 304, 308 (7th Cir.1985), *cert. denied*, 474 U.S. 1082, 106 S.Ct. 852, 88 L.Ed.2d 893 (1986)).

Since *Terry* was decided, several attempts have been made at formulating more specifically the requirements of reasonable suspicion. In *United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989), the Court stated that reasonable suspicion entails " 'some minimal level of objective justification' for making a stop"—that is, something more than an " 'inchoate and unparticularized suspicion or "hunch" ' " but less than the level of suspicion required for probable cause (citations omitted). In *United States v. Cortez*, 449 U.S. 411, 417–18, 101 S.Ct. 690, 694–95, 66 L.Ed.2d 621 (1981), the Court said:

> [T]he essence of all that has been written is that the totality of the circumstances— the whole picture—must be taken into account. . . .
>
> The process does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain common-sense conclusions about human behavior; jurors as factfinders are permitted to do the same—and so are law enforcement officers.

■ The facts in this case suggest that a reasonable officer would be justified in believing that there was reasonable suspicion sufficient to conduct an investigatory stop. While the broadcast was somewhat vague, it made clear that there had been an incident that resulted in a person or persons being

---

4. The transcript of the evidentiary hearing reveals that the purpose of the hearing was to ascertain whether there was reasonable suspicion to support the original stop *and* whether there was probable cause for the subsequent arrest. Tr. of May 14, 1992 at 32, 58.

taken into custody. No particular crime was articulated, but it was not unreasonable for the officers to believe (a) that the brown station wagon that they encountered in the vicinity of the incident might be the one that Squad 710 officers were looking for, and (b) that the incident that the Squad 710 officers were involved in carried the strong suggestion of illegal activity. The magistrate judge found that Mr. Wilson had accomplished a rather precipitate exit from a moving car; the fact that this action might constitute a violation of a Wisconsin ordinance certainly would justify an officer's believing that at least an investigatory stop would be in order. In addition, when Mr. Wilson ran away, he certainly did not improve his situation. While the Supreme Court has never had occasion to decide whether flight alone may constitute reasonable suspicion, *see California v. Hodari D.*, 499 U.S. 621, ——, n. 1, 111 S.Ct. 1547, 1549 n. 1, 113 L.Ed.2d 690 (1991), it is clearly a relevant factor. *See United States v. Sharpe*, 470 U.S. 675, 682–83 n. 3, 105 S.Ct. 1568, 1573 n. 3, 84 L.Ed.2d 605 (1985); *Tom v. Voida*, 963 F.2d 952, 958 (7th Cir.1992); *United States v. Cardona–Rivera*, 904 F.2d 1149, 1153 (7th Cir.1990). Not only did Mr. Wilson flee a law enforcement officer, but he also renewed his efforts even after being confronted by the officer's drawn firearm. In short, in light of the totality of the circumstances, including the inferences that reasonably may be drawn, Officer Gajevic would have been justified in believing that he would be within his right to conduct a *Terry* stop.

Having determined that there was a measure of reasonable suspicion sufficient to justify a stop, we must consider the significance of the fact that Officer Gajevic immediately handcuffed Mr. Wilson. There can be little question that a suspect placed in handcuffs is not free to leave and, for all practical purposes, is in police custody, but this circuit has not found that handcuffing automatically constitutes an arrest for that reason.

In *United States v. Glenna*, 878 F.2d 967 (7th Cir.1989), although noting that "the thought of allowing police officers to handcuff persons when probable cause to arrest is lacking is a troubling one," *id.* at 972, we found justification for the use of handcuffs when the local police had received a Teletype from the state police informing them that the suspect could be a drug dealer carrying money, firearms and explosives and when, in the course of an investigative stop, the police found a clip of ammunition in the suspect's pocket. Under these circumstances we refused to hold that the use of handcuffs *automatically* converted the stop into an arrest. We looked, rather, at whether "the restraint was temporary and lasted no longer than was necessary to effectuate the purpose of the stop, and whether the methods employed were the least intrusive means reasonably available to verify or dispel the officers [sic] suspicion in a short period of time." *Glenna*, 878 F.2d at 972.[5]

Quite recently we had occasion to examine the use of handcuffs again in *Tom*, 963 F.2d at 958, and we upheld their use in an investigatory stop. There an officer approached a teenager who grabbed a new bicycle in a high crime neighborhood and fled, glancing back at the officer. Finally, the officer caught up with the teenager and attempted to cuff him. We found that this was a "measured use of force, could have been brief, and was appropriate to accomplish the purposes of an investigatory stop." *Id.* We concluded that the handcuffing was justified because

---

5. Similarly, in *United States v. Serna–Barreto*, 842 F.2d 965, 968 (7th Cir.1988), we declined to find that an arrest had automatically been effectuated when the police officers had drawn guns because we recognized that in that case officer safety required such a measure. In *Serna–Barreto*, we said that

> [a]lthough we are troubled by the thought of allowing policemen to stop people at the point of a gun when probable cause to arrest is lacking, we are unwilling to hold that an investigative stop is never lawful when it can be effectuated safely only in that manner. It is

> not nice to have a gun pointed at you by a policeman but it is worse to have a gun pointed at you by a criminal, so there is a complex tradeoff involved in any proposal to reduce (or increase) the permissible scope of investigatory stops. We need not decide in this case just how great that scope should be, though clearly we are near the outer edge.

*Id.* Factors that influenced the court in *Serna–Barreto* were that the encounter occurred at night and that the suspects were in a car and therefore not in full view. *Id.*

the suspect was fleeing and because the suspect's own actions necessitated such a measure. *Id.*[6]

Here Mr. Wilson was certainly very actively evading an officer, and showed every indication that he would again attempt to do so. After all, Mr. Wilson had already risked injury and defied the police officer's assertion of authority when he fled in the face of a drawn firearm. The circumstances surrounding the chase were potentially dangerous: the encounter occurred in the dead of night in a residential community. We have no information about how well illumined the area was, but it is safe to assume that the hour considerably increased the potential danger level. Furthermore, when he finally accosted Mr. Wilson, Officer Gajevic was not accompanied by other officers. The suspect was hiding under a porch and the officer ordered him to crawl out. At this point, we believe that the officer was justified in handcuffing Mr. Wilson in the interests of his own safety and the safety of anyone else who might have been in the area. The officer's actions were a "reasonably graduated response to the demands of the situation." *Glenna,* 878 F.2d at 972. At the time he placed the handcuffs on Mr. Wilson, the officer did no violence to the integrity of the investigative stop. It was justified by reasonable suspicion and was conducted in a manner commensurate with the particular circumstances.

But timing was all. A critical factor in determining whether a seizure is reasonable under the *Terry* exception to the principle that probable cause is required for a seizure is the length of the detention. *See United States v. Place,* 462 U.S. 696, 709, 103 S.Ct. 2637, 2645, 77 L.Ed.2d 110 (1983). In the case before us, we need not belabor whether the officer was pursuing actively the investigation during the time Mr. Wilson was handcuffed because there was scarcely time to do so before the probable cause was established by the advent of the suspected mari-

juana. Officer Koch entered the scene, within seconds of the handcuffing, with two baggies containing what appeared to be marijuana that he said Mr. Wilson had thrown away during the chase. The baggies supplied the probable cause that indisputably converted the encounter into a full arrest. At this point, it is without question that the officer had probable cause to arrest Mr. Wilson.

After Mr. Wilson was taken to the station to be booked he was searched, and this search produced the drugs and drug paraphernalia that ultimately formed one of the bases for the charge. There can be no question that this search was a valid search incident to arrest. *See Chimel v. California,* 395 U.S. 752, 762–63, 89 S.Ct. 2034, 2039–40, 23 L.Ed.2d 685 (1969); *United States v. Rodriguez,* 995 F.2d 776, 777 (7th Cir.1993).

Both the magistrate judge and the district court agreed that the weapons that were observed in Mr. Wilson's car were properly seized under the plain view doctrine. *See Horton v. California,* 496 U.S. 128, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990); *United States v. Berkowitz,* 927 F.2d 1376, 1388 (7th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 141, 116 L.Ed.2d 108 (1991). The admission into evidence of the firearms formed the basis for the charge that Mr. Wilson was a felon in possession of a firearm. The plain view doctrine requires both that the officer have a lawful right to be in the position to see the items and that the evidentiary value of the items be immediately apparent. *Horton,* 496 U.S. at 142, 110 S.Ct. at 2311. Mr. Wilson argues that the necessary nexus is missing between the items in plain view and the suspected criminal activity. *See Warden v. Hayden,* 387 U.S. 294, 307, 87 S.Ct. 1642, 1650, 18 L.Ed.2d 782 (1967). The government notes, however, that the incriminating nature of the weapons was immediately apparent because Wisconsin law does not permit firearms to be readily accessible to automobile occupants. *See* Wis. Stat. § 167.-31(2)(b) (1989) (requiring that firearms being

---

**6.** We also cited an analogous situation where the Supreme Court found that the use of a drawn gun was justified during a *Terry* stop. *See United*

transported be encased and unloaded).[7]

■ We also point out that, given the circumstances detailed in the record, it is clear that the weapons could have been admitted into evidence in a number of other ways. The government is correct that the evidence would have been discovered inevitably by lawful means. *See Nix v. Williams,* 467 U.S. 431, 448, 104 S.Ct. 2501, 2511, 81 L.Ed.2d 377 (1984). Officer Dalland approached Mr. Wilson's car in the alley immediately after Mr. Wilson fled because a passenger remained in it. He also wished to see whether the car was still in gear after coming to rest against the pole. At this point he saw the weapons in plain view through the open door and apparently radioed to Officer Gajevic, who received the message after he had been informed of the recovered baggies of what appeared to be marijuana. Tr. of May 14, 1992 at 64. When Officer Gajevic returned to the car, he too saw the weapons in plain view and took possession of them at that point. Additionally, the firearms could have been properly removed from the car, as a public safety measure, to prevent intruders from making off with them if the car were to be secured and left in the alley. *See Cady v. Dombrowski,* 413 U.S. 433, 448, 93 S.Ct. 2523, 2531, 37 L.Ed.2d 706 (1973); *United States v. Ware,* 914 F.2d 997, 1000–01 (7th Cir.1990). Because the guns could have come into the lawful possession of the police in a number of ways, there was no error in the denial of the motion to suppress their admission into evidence.

### Conclusion

For the foregoing reasons, the judgment of the district court is affirmed.

AFFIRMED.

*States v. Hensley,* 469 U.S. 221, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985).

7. At the hearing the government said that "transporting two guns in that manner was a violation of the law." Tr. of May 14, 1992 at 74.