12 F.3d 1101
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Robert H. HOARD, Defendant-Appellant.
 No. 92-3205.
 United States Court of Appeals, Seventh Circuit.
 Argued June 3, 1993.
Decided Nov. 17, 1993.
 
 Before: POSNER, Chief Judge, and RIPPLE, and ILANA D. ROVNER, Circuit Judges.
 
 ORDER
 
 1
 Robert H. Hoard was tried before a jury and convicted of possession of a firearm by a felon in violation of 18 U.S.C. Sec. 922(g)(1), possession of heroin with the intent to distribute in violation of 21 U.S.C. Sec. 841(a)(1), and using and carrying a firearm during and in relation to the commission of a drug trafficking offense in violation of 18 U.S.C. Sec. 924(c). The district court sentenced Hoard to serve twenty-four months' imprisonment on Counts One and Two, and ordered that the mandatory five-year term of incarceration imposed under Sec. 924(c) on Count Three run consecutive to all other sentences. Hoard appeals, arguing that the district court erred in denying his pretrial motion to quash his arrest and suppress evidence, in imposing a two-level enhancement for obstruction of justice, and in ordering the five-year term imposed under Sec. 924(c) to be served consecutively rather than concurrently. For the reasons set forth below, we affirm.
 
 I. BACKGROUND
 
 2
 Acting upon information that individuals with valid firearm owner identification cards would purchase firearms and transfer them to people not qualified to own them, agents from the Bureau of Alcohol, Tobacco and Firearms ("ATF") observed three individuals enter the A & M gun dealership in Northlake, Illinois on March 30, 1991. An agent inside the store watched these individuals complete the firearms transaction, then informed the agents outside that the guns had been placed in a white bag. The agents stationed outside observed the three men exit the store and noted that one of them carried a white bag, which he placed in the trunk of a car. The three men then entered the car and drove away.
 
 
 3
 The agents followed the car to the parking lot of a housing project located in the 900 block of south Racine Avenue in Chicago. Hoard, a resident of the housing project, was standing with a group of other individuals in the parking lot area. Hoard began walking toward the three men as they exited the vehicle, and, according to ATF Agent Rene Jaquez, proceeded toward the rear of the car. After the individuals opened the trunk of the car, an arrest signal was given and the agents moved in. Jaquez ordered Hoard to the ground, handcuffed him for safety purposes, and then conducted a pat-down search of his outer clothing. This initial search revealed that Hoard was carrying a loaded .380 caliber semi-automatic handgun in the front pocket of his pants. When Jaquez then searched Hoard more thoroughly, he discovered that Hoard was wearing a bullet-proof vest and was carrying .59 grams of heroin, packaged for street-level distribution, and over $300.00 in cash. Hoard was then taken into police custody.
 
 
 4
 Hoard moved to quash his arrest and to suppress the evidence seized from him on the grounds that there was no reasonable suspicion to stop him and no probable cause for an arrest and search. He argued that he was not in close proximity to the vehicle, that there was nothing to connect him to the three individuals in the car, and that he was not engaged in any suspicious or criminal behavior at the time. At the hearing on the motion, Jaquez testified that Hoard was stopped because he was near the trunk of the car which contained the recently purchased weapons. Based on Hoard's proximity to the weapons and the three men who had obtained the guns, the agent inferred that Hoard might be associated with the firearms purchase, and for safety reasons, he decided to stop and frisk Hoard. Hoard presented a witness at the hearing who testified that Hoard was ten to fifteen feet from the vehicle at the time of his arrest. That witness also testified, however, that he saw Hoard talking with one of the three men at the time the agents moved in.
 
 
 5
 After hearing the testimony, the district court denied Hoard's motion. R. 24. The court reasoned that even if Hoard was merely a curious passer-by rather than an associate of the men that the agents had followed to the parking lot, the known presence of the guns in the vehicle coupled with the suspected illegal firearms transaction created a reasonable suspicion on the part of the officers that Hoard was linked to the illegal gun activity and posed a potential threat to the officers. Suppr.Tr. 67. The court thus concluded that the agents had a proper basis on which to stop and frisk Hoard and, once the frisk was conducted and the gun discovered, to search him more carefully and arrest him. See id. at 45-46, 66-67. Accordingly, the case proceeded to trial before a jury.
 
 
 6
 After the second day of trial, Hoard telephoned his mother's home from the Metropolitan Correctional Center ("MCC") and spoke with Jermaine Pryor, who had witnessed Hoard's arrest and was expected to testify for the defense. The conversation was tape recorded by the MCC. During that conversation, Hoard and Pryor discussed what Pryor had observed prior to and during the arrest and search. Hoard told Pryor to tell the truth about what he observed but not to elaborate as to the extent of their friendship. He advised Pryor that it would be best to say only that he knew Hoard from around the neighborhood.
 
 
 7
 On the following day, the defense called Pryor to the stand. Pryor testified that he and Hoard were neighbors and "knew each other from just living right around the same area" and "seeing [one another] occasionally." Tr. 158. He also testified that he saw ATF agents run toward the defendant, order him to the ground, place him against a car in a spread-eagle stance, and proceed to search him. Tr. 165-69. According to Pryor, the agents did not take anything except some cash and the bulletproof vest from Hoard's person during the search. Id. at 169; see also id. at 174. When asked on cross-examination whether he had discussed his testimony with Hoard, Pryor denied that he had. Id. at 173, 178. In rebuttal, the government played the tape-recorded telephone conversation between Hoard and Pryor. Pryor then testified in surrebuttal that he had misunderstood the government's question and stated that although he had "flavored down" his testimony somewhat regarding his relationship with Hoard, he had not lied about what he had observed. Id. at 200, 203-04, 205-12. Pryor also asserted that Hoard had not influenced his testimony, but rather that their conversation had served only to refresh his memory. Id. at 205. At the conclusion of trial, the jury returned a verdict of guilty on all counts.
 
 
 8
 The Presentence Investigation Report ("PSR") recommended a two-level enhancement for obstruction of justice under Guideline section 3C1.1, based on Hoard's telephone conversation with Pryor. Prior to sentencing, Hoard filed a number of objections to the PSR, including an objection to the proposed obstruction of justice enhancement. The district court overruled Hoard's objection and imposed the enhancement, finding that Hoard had willfully attempted to tailor Pryor's testimony in order to create an impression for the jury that, absent Hoard's influence, would not otherwise have been conveyed. The district court imposed a sentence of 24 months on Counts One and Two (the firearm and heroin possession charges) to run concurrently with a thirteen-year sentence imposed by the state court for a probation violation. The district court also imposed the mandatory five-year term required by Sec. 924(c) on Count Three and concluded that under the law that sentence must run consecutively to the state sentence and the sentence it had imposed on Counts One and Two. The defendant appeals both his conviction and sentence.
 
 II. DISCUSSION
 
 9
 A. Motion to Quash Arrest and Suppress Evidence
 
 
 10
 Hoard argues that the district court erred in denying the motion to quash his arrest and suppress evidence. Citing Jaquez's testimony that prior to the pat-down search he had no reason to believe that Hoard had a weapon, Hoard contends that the government failed to establish a particularized and objective basis for the agent to believe that Hoard posed a threat to his own safety or that of others. Any attempt to connect him to the suspected illegal firearms transaction, Hoard argues, was mere speculation. Thus, in Hoard's view, the gun, as well as the heroin and cash subsequently found in his pocket, were the products of an illegal search.
 
 
 11
 We will not disturb a district court's denial of a suppression motion unless the denial was based on clearly erroneous factual and legal determinations. United States v. Rice, 995 F.2d 719, 722 (7th Cir.1993); United States v. Adebayo, 985 F.2d 1333, 1337 (7th Cir.), cert. denied, 113 S.Ct. 2947 (1993); United States v. Spears, 965 F.2d 262, 269 (7th Cir.), cert. denied, 113 S.Ct. 502 (1992). In reviewing a ruling on a motion to suppress, we give particular deference to the factual findings of the district court, which had the opportunity to hear the testimony and observe the demeanor of the witnesses. United States v. Johnson, 910 F.2d 1506, 1508 (7th Cir.1990) (citing United States v. Edwards, 898 F.2d 1273, 1276 (7th Cir.1990)), cert. denied, 498 U.S. 1051, 111 S.Ct. 764 (1991). And we will accept the district court's findings of fact and credibility determinations unless we are left with the definite and firm conviction that a mistake has been committed. Rice, 995 F.2d at 722; United States v. Somers, 950 F.2d 1279, 1284 (7th Cir.1991), cert. denied, 112 S.Ct. 1959 (1992). We must be mindful, of course, that "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." Id. (internal quotation marks and citations omitted).
 
 
 12
 Here, the district court posited two alternative explanations for the circumstances presented. The first assumed a prearrangement between Hoard and the purchasers of the firearms. Although the agents had no knowledge of any such arrangement, they had reason to believe that a serious firearms offense was taking place, and they observed Hoard interact with the individuals suspected of that illegal activity in the vicinity of the weapons. The officers then took control of Hoard (as well as the others) and frisked him. Suppr.Tr. 66-67. Alternatively, it was possible that Hoard was just a bystander who wandered over "out of innocent curiosity" and looked into the trunk. Even under that scenario, however, the court observed that "the way it looks to the officers is at least enough of a possibility that there was some involvement in it, either prearranged or pre-existing without arrangement, that they ha[d] the right to make an investigatory stop and at least the frisk." Id. 67. Ultimately, the district court concluded, and we believe correctly, that reasonable law enforcement officers "could draw the inference that Hoard was somehow a confederate of those persons [who had purchased the firearms], and while they may not have had probable cause, for example, to get a search warrant to search Hoard's house, they certainly had reasonable cause to do a stop and a frisk...." Id. 45-46; see also id. 66-67.
 
 
 13
 Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868 (1968), established a narrowly circumscribed authority to search an individual for weapons without probable cause for the protection of law enforcement officers and others present at the scene. This exception may be invoked when the officer "has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime." Id. at 27, 88 S.Ct. at 1883. Underlying the exception is the need to balance the nature and extent of the intrusion on the individual's Fourth Amendment interests against the importance of governmental interests in effectively investigating criminal activity while minimizing the risk of harm both to the officers and to others. See United States v. Place, 462 U.S. 696, 703, 103 S.Ct. 2637, 2642 (1983). The extent of the intrusion therefore must be justifiably related to the reason for the stop. Viewing the degrees of detention on a spectrum, at one end is an arrest, which requires that the police have probable cause to believe that the individual has committed or is committing a crime. United States v. Wilson, 2 F.3d 226, 229 (7th Cir.1993); Johnson, 910 F.2d at 1508 (citing Beck v. Ohio, 379 U.S. 89, 85 S.Ct. 223 (1964)). In the mid-range of the spectrum is an investigatory stop of the kind first outlined in Terry--that is, a brief, non-intrusive detention of an individual, justified by specific and articulable facts giving rise to a reasonable suspicion that the person has been, is, or is about to be engaged in criminal activity. See Place, 462 U.S. at 702, 103 S.Ct. at 2642 (discussing Terry, 393 U.S. at 22, 88 S.Ct. at 1880); Wilson, 2 F.3d at 229; Johnson, 910 F.2d at 1508. At the other end is a consensual encounter--not considered a seizure within the meaning of the Fourth Amendment--in which the citizen voluntarily cooperates with an officer's non-coercive questioning. Wilson, 2 F.3d at 229; Johnson, 910 F.2d at 1508 (citing United States v. Mendenhall, 446 U.S. 544, 553-55, 100 S.Ct. 1870, 1876-77 (1980)). Because the demands of any particular situation may escalate, however, it is imperative that authorities be allowed to graduate their responses to address the circumstances as they progress along a continuum. See United States v. Glenna, 878 F.2d 967, 971 (7th Cir.1989). Thus, in assessing the reasonableness of the encounter, we consider first whether the agent had justifiable grounds to insist on the initial encounter and second, whether it was reasonably related in scope to the circumstances which justified the interference in the first instance. United States v. Smith, 3 F.3d 1088, 1095 (7th Cir.1993); United States v. Ocampo, 890 F.2d 1363, 1369 (7th Cir.1989); Glenna, 878 F.2d at 971.
 
 
 14
 As we have noted, an investigatory stop is justified if law enforcement agents can identify specific articulable facts sufficient to give rise to a reasonable suspicion that an individual has, is, or is about to commit a crime. Adebayo, 985 F.2d at 1339; see also Wilson, slip op. at 9-10. In determining the propriety of an investigative stop and search, a reviewing court must consider whether the officers' actions were objectively reasonable in light of the totality of the circumstances confronting them. Id. Accordingly, whether a detention falls within the rubric of a permissible Terry stop must be decided on a case-by-case basis, considering such factors as the nature of the suspected crime, the length of the intrusion on the individual's Fourth Amendment interests, the degree of suspicion supporting the stop, the location of the stop, and the suspect's reaction to the officer's approach and inquiry. Ocampo, 890 F.2d at 1369; see also United States v. Boden, 854 F.2d 983, 992-93 (7th Cir.1988).
 
 
 15
 Here, based on information that an illegal arms transaction was about to occur, ATF agents witnessed three men purchase two Intertec Tec .22 caliber 9mm pistols and transport them in the trunk of a car to the parking lot on south Racine Avenue. The defendant was standing with a group of individuals in the parking lot as the car entered and parked. Testimony at the suppression hearing revealed that after the car was parked, the driver motioned to Hoard. Hoard was then observed walking toward the vehicle as the three men exited the car and moved toward the trunk. Suppr.Tr. 38. Hoard's own witness recalled that Hoard spoke to one of the men. Id. 55, 61. By the time the trunk was opened and the firearms removed, Hoard was standing at the trunk, according to Agent Jaquez. Id. 30, 39. At the moment the ATF agents identified themselves and began to move in, Hoard began walking away from the car. Id. 31, 41-42. Jaquez then ordered Hoard to stop and proceeded to conduct a pat-down search of his person. Although Jaquez acknowledged that he did not have reason to believe that Hoard possessed a weapon, he testified that based on the anticipated illegal firearms transaction and Hoard's presence near the weapons in the trunk of the car, he suspected that Hoard might pose a danger to the agents. Id. 43.
 
 
 16
 When an officer has a reasonable, articulable basis for believing that an individual is involved in criminal activity, he may briefly stop that person to make a reasonable inquiry aimed at confirming or dispelling his suspicions. Terry, 392 U.S. at 30, 88 S.Ct. at 1884; Boden, 854 F.2d at 992. If the officer is further justified in believing that the individual he is investigating is dangerous, the officer may conduct a limited pat-down search of his outer clothing, not to discover evidence of the suspected crime, but to allow the officer to pursue his inquiry without fear of violence. Terry, 392 U.S. at 24, 88 S.Ct. at 1881; see also Adams v. Williams, 407 U.S. 143, 146, 92 S.Ct. 1921, 1923 (1972).
 
 
 17
 The limited search authorized by Terry, however, does not permit a generalized cursory search for weapons of any person whose "mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person." Ybarra v. Illinois, 444 U.S. 85, 94, 100 S.Ct. 338, 342 (1979) (citing Sibron v. New York, 392 U.S. 40, 62-63, 88 S.Ct. 1889, 1902 (1968)). This prohibition, Hoard argues, restricts any reasonable suspicion regarding illegal weapons activity to the three individuals observed purchasing and transporting the firearms and cannot be borrowed or implicitly applied to him. However, in distinguishing "mere association" from other evidence of criminal activity, the critical inquiry focuses not on how "person-specific" the officers' information is but rather on the reliability of the inference that can be drawn from this information. United States v. Chaidez, 919 F.2d 1193, 1200 (7th Cir.1990), cert. denied, 111 S.Ct. 2861, 112 S.Ct. 209 (1991). Hoard's apparent association with individuals known to be in possession of firearms and suspected of transferring those weapons illegally (as evidenced not only by his proximity to these individuals but also his interaction with one of them) is certainly probative and material evidence in assessing whether Hoard was connected with the criminal activity. At the same time, Jaquez's testimony, which the district court was entitled to credit, placed Hoard near the trunk of the car, suggesting that Hoard may have been involved with the anticipated transfer of the guns that the officers knew to be inside the trunk. Furthermore, when the agents announced their office, Hoard began to move away from the vehicle and the three men. Attempting to evade association is also relevant to the inference that Hoard was somehow involved with them. Cf. Wilson, 2 F.3d at 231.
 
 
 18
 Moreover, where the police reasonably suspect that an illegal arms transaction is about to take place and know that firearms are present, it is not unreasonable for them to be concerned for their safety. Terry clearly allows agents to take minimal precautionary measures to protect themselves and others from possible danger posed by one suspected of illegal activity, and the agents did not exceed the scope of that authority in this case. In approving a limited weapons search, the Court in Terry stated:
 
 
 19
 The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger. And in determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate and unparticularized suspicion or "hunch," but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience.
 
 
 20
 Terry, 392 U.S. at 27, 88 S.Ct. at 1883 (citations omitted). Here, the investigation of individuals known to be in possession of firearms and suspected of illegally transferring those weapons to others gave rise to a reasonable suspicion of criminal activity and, given the nature of that activity, reasonably warranted the belief that the safety of the officers or that of others might be in jeopardy. Under these circumstances, Hoard's presence and interaction with the three men next to the car containing the firearms reasonably warranted the belief that he was connected with the suspected firearms transaction and, indeed, might be the intended recipient of the weapons. This in turn supplied a ground on which the officers might reasonably believe that Hoard himself posed an immediate threat of harm.
 
 
 21
 Pursuant to a lawful investigatory stop, Jaquez conducted a legitimate pat-down search of Hoard's outer clothing and discovered that he was carrying a loaded semi-automatic handgun.[1] At this point, when Jaquez proceeded to search Hoard more thoroughly, the intrusion ripened into a custodial arrest requiring probable cause. Probable cause to arrest exists if, at the time of arrest, the facts and circumstances within the officer's knowledge would lead a reasonably prudent person to believe that an offense has been committed. See United States v. Burrell, 963 F.2d 976, 986 (7th Cir.), cert. denied, 113 S.Ct. 357 (1992). Discovery of the gun altered the scope of the circumstances which had justified the initial stop and created a sufficient basis on which to believe that Hoard unlawfully possessed the firearm.[2] Relying on the belief that Hoard had committed an offense, Jaquez conducted a more thorough search of Hoard. Tr. 36. The search of Hoard's inner garments revealed that he was also in possession of a clear plastic baggie containing ten tin-foil-wrapped packages of heroin and was wearing a bulletproof vest. Id. at 36-40. These items confirmed that Hoard was involved in illicit activity.
 
 
 22
 Under all of these circumstances, which are amply established by the record, we cannot conclude that the district court committed clear error when it denied the defendant's motion to quash arrest and suppress evidence.
 
 B. Obstruction of Justice
 
 23
 Hoard also challenges the imposition of the two-level enhancement pursuant to U.S.S.G. Sec. 3C1.1. He claims that the district court erred in finding that he willfully obstructed justice by advising Jermaine Pryor not to indicate the extent of their friendship when he testified on Hoard's behalf. Section 3C1.1 provides: "If the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense, increase the offense level by 2 levels." U.S.S.G. Sec. 3C1.1 (1991). "[T]hreatening, intimidating, or otherwise unlawfully influencing a co-defendant, witness, or juror, directly or indirectly, or attempting to do so" is included in the non-exhaustive list of examples of conduct to which the obstruction enhancement applies. Id., Application Note 3(a). Following the dictates of the guideline commentary, we have held that "an attempt to influence a potential witness is an attempt to obstruct justice under Sec. 3C1.1." United States v. Cherif, 943 F.2d 692, 703 (7th Cir.1991), cert. denied, 112 S.Ct. 1564 (1992). Hoard nonetheless maintains that the two-level enhancement was improper because the government failed to prove by a preponderance of the evidence both that he intended to obstruct justice when he spoke with Pryor and that Pryor's testimony regarding the extent of their friendship was material.
 
 
 24
 To support his position that willfulness was not proved, Hoard relies on the district court's observation that the conversation was susceptible of an innocent interpretation. Tr. 258. Yet, although the court acknowledged that an innocent interpretation of Hoard's conversation with Pryor was possible, it ultimately determined, based on the totality of the circumstances, that the conversation was not innocent. The court explained:
 
 
 25
 I consider in this case the vocal demeanor of Mr. Hoard as I heard it on the tape, I consider the evidence in this case as a whole, and I consider the nature of the evidence presented at the motion to suppress; and on the basis of those things I conclude that the assessment of the obstruction of justice enhancement or increase is justified.
 
 
 26
 I think Mr. Hoard was not interested in the truth, and I think for many defendants in criminal cases that's not saying anything that is either particularly shocking or particularly difficult to understand. But I think that Mr. Hoard clearly stepped over the line in attempting to tailor evidence and to give an impression to a jury that was not justified by what would have occurred without his intervention.
 
 
 27
 Id. at 259-60. We will not reverse a finding of obstruction of justice unless it is clearly erroneous. United States v. Price, 988 F.2d 712, 721 (7th Cir.1993). In reviewing findings of fact under the clearly erroneous standard, we give due deference to the district court, which was in the best position to judge the credibility of the witnesses. United States v. Beal, 960 F.2d 629, 634 (7th Cir.), cert. denied, 113 S.Ct. 230 (1992). Hoard's telephone conversation with Pryor occurred on the evening of the second day of trial, after Hoard had heard the government's case against him and had the opportunity to assess his chances. The tape recording of the conversation itself reveals a purposeful effort by Hoard to coach Pryor as to what he should say about their relationship. When confronted with the tape recording Pryor admitted that he had "flavored down" his testimony regarding his relationship with Hoard. These facts lend ample support to the district court's conclusion that Hoard willfully influenced Pryor to modify his testimony.
 
 
 28
 Hoard argues nonetheless that the degree of their friendship was not a matter material to his guilt or innocence and therefore did not justify the imposition of the two-level enhancement. We note, however, that the guideline itself does not impose a materiality requirement, nor do all of the examples of covered conduct cited in the commentary. In particular, the commentary does not suggest that when the defendant attempts to influence a witness, his effort must concern a "material" aspect of the witness' testimony. See Application Note 3(a); United States v. Snider, 976 F.2d 1249, 1251-52 (9th Cir.1992). True, other examples cited in the commentary do include a materiality requirement. See Application Note 3(d) ("destroying or concealing or directing or procuring another person to destroy or conceal evidence that is material to an official investigation or judicial proceeding ... or attempting to do so"); 3(f) ("providing materially false information to a judge or magistrate"); 3(g) ("providing a materially false statement to a law enforcement officer that significantly obstructed or impeded the official investigation or prosecution of the instant offense"); 3(h) ("providing materially false information to a probation officer in respect to a presentence or other investigation for the court"). But the omission of such a materiality requirement from the example cited in Note 3(a), as well as other examples, see Note 3(b), (c), and (e), suggests that when the defendant influences or attempts to influence a witness, the government is not necessarily required to prove that it concerned a material aspect of the witness' testimony in order for the enhancement to apply.
 
 
 29
 Even if we were to assume that materiality must be shown in this circumstance, the record adequately demonstrates that Hoard's effort to influence Pryor did concern a material question. The appropriate interpretation of the meaning of the word "material" under Sec. 3C1.1 is a matter of law reviewed de novo. United States v. Lozoya-Morales, 931 F.2d 1216, 1218 (7th Cir.1991). The commentary to section 3C1.1 states that " '[m]aterial' evidence, fact, statement, or information, as used in this section, means evidence, fact, statement, or information that, if believed, would tend to influence or affect the issue under determination." Application Note 5. Because this definition of "material" does not expressly reference the credibility of a witness, Hoard assumes that the drafters of the Guidelines did not consider it a factor "affecting" the issue under determination. We cannot agree, however, that the credibility of a witness should be deemed immaterial simply because the commentary does not mention it. Hoard does not dispute that Pryor's testimony itself was material as defined in the commentary. Pryor testified that when Hoard was patted down, nothing was taken from him except a bulletproof vest and some cash. Tr. 169. Pryor specifically denied seeing any foil packets or gun being removed from Hoard's pockets. Id. 174. Thus, Pryor's testimony directly contradicted the central allegation underlying the government's case against Hoard--that the agents had discovered a gun and packets of heroin in his possession. In this sense, Pryor's credibility was necessarily material. Nor can there be any doubt that by advising Pryor to minimize the extent of their friendship, Hoard was attempting to influence the jury's assessment of Pryor's credibility and bias. The fact that Hoard's efforts were exposed does not preclude a finding that he deliberately attempted to obstruct or impede the administration of justice. See, e.g., United States v. Brach, 942 F.2d 141, 145 (2d Cir.1991). Materiality depends not on whether the statement was believed but rather on whether the false statement if believed would tend to affect the jury's assessment of guilt or innocence. United States v. Rodriguez, 943 F.2d 215, 218 (2d Cir.1991).
 
 
 30
 The district court's conclusion that Hoard deliberately sought to create a false impression that would influence the jury's assessment of Pryor's credibility rests on the court's first-hand assessment of the totality of the circumstances before it and finds ample support in the record. We therefore discern no clear error in the court's imposition of the enhancement.
 
 
 31
 C. Section 924(c) Sentence Imposed Consecutive to State Sentence
 
 
 32
 Hoard's final argument is that the district court erred by ordering that the mandatory five-year sentence imposed under 18 U.S.C. Sec. 924(c) run consecutively to the thirteen-year sentence imposed by the state court for a violation of probation, rather than concurrently, as the district court had ordered with respect to the 24-month sentence it imposed on Counts One and Two. Section 924(c) provides in pertinent part:
 
 
 33
 Whoever, during and in relation to any crime of violence or drug trafficking crime ... for which he may be prosecuted in a court of the United States, uses or carries a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime, be sentenced to imprisonment for five years.... Notwithstanding any other provision of law, the court shall not place on probation or suspend the sentence of any person convicted of a violation of this subsection, nor shall the term of imprisonment imposed under this subsection run concurrently with any other term of imprisonment including that imposed for the crime of violence or drug trafficking crime in which the firearm was used or carried.
 
 
 34
 18 U.S.C. Sec. 924(c)(1) (emphasis added).
 
 
 35
 Hoard contends that the consecutive sentence requirement does not apply to a sentence imposed in state court. Seizing on the language "for which he may be prosecuted in a court of the United States," Hoard argues that the statute dictates that the mandatory five-year minimum term run consecutive only to federal offenses of crimes of violence or drug trafficking. Yet, that language has nothing to do with whether or not the sentence imposed under Sec. 924(c) should be served concurrently with another sentence. In this regard, the statute unequivocally states that a Sec. 924(c) term of imprisonment shall not "run concurrently with any other term of imprisonment." (Emphasis added.) Contrary to Hoard's contention, the statute is not ambiguous. See United States v. Garrett, 903 F.2d 1105, 1114 (7th Cir.), cert. denied, 498 U.S. 905, 111 S.Ct. 272 (1990); United States v. Hunter, 887 F.2d 1001, 1002 (9th Cir.1989), cert. denied, 493 U.S. 1090, 110 S.Ct. 1159 (1990) (per curiam); see also Deal v. United States, 113 S.Ct. 1993, 1998 (1993). In view of the clear language of the statute, "any other term of imprisonment" encompasses a sentence imposed by a state court. See, e.g., United States v. D'Iguillont, 979 F.2d 612, 615 (7th Cir.1992) (affirming sentence imposed under Sec. 924(c) consecutive to state court sentence), cert. denied, 113 S.Ct. 1873 (1993); United States v. Campusano, 947 F.2d 1, 2 (1st Cir.1991) (same). The language of the statute clearly reflects the intention of Congress that a Sec. 924(c) conviction result in additional, consecutive punishment. See S.Rep. No. 98-225, 98th Cong., 2d Sess. 312-14 (1984), reprinted in 1984 U.S.C.C.A.N. 3182, 3490-3492. Accordingly, the district court correctly determined that the Sec. 924(c) penalty may not be served concurrently with a state sentence.
 
 III. CONCLUSION
 
 36
 For the foregoing reasons, we AFFIRM the defendant's conviction and the sentence imposed by the district court.
 
 
 
 [1]
 Although the record indicates that Jaquez handcuffed Hoard before patting him down (Tr. 30-31), and although the use of handcuffs is sometimes indicative of an arrest as opposed to an investigatory stop, see Wilson, 2 F.3d at 231, Hoard does not argue that Jaquez exceeded the scope of a Terry stop in applying the handcuffs almost immediately, before any contraband was discovered. In any case, as our opinion in Wilson makes clear, the brief use of handcuffs to secure an individual who might otherwise pose a danger to the investigating officers is not unreasonable. 2 F.3d at 231-32
 
 
 [2]
 Illinois prohibits a private citizen from carrying a concealed weapon (720 ILCS 5/24-1(4) (Smith-Hurd 1993)), as does the City of Chicago (Municipal Code of Chicago Secs. 8-20-010, 8-24-020 (1990))